**UNITED STATES of America,**
Appellee,

v.

**Howard ROSS and Paul Gordon,**
Defendants-Appellants.

No. 335, Docket 28033.

United States Court of Appeals
Second Circuit.

Argued May 27, 1963.

Decided July 5, 1963.

Certiorari Denied Oct. 28, 1963.

See 84 S.Ct. 170.

Milton S. Gould, New York City (Gallop, Climenko & Gould, New York City, Alan J. Hartnick, New York City, of counsel), for appellant Howard Ross.

Jacob W. Friedman, New York City, for appellant Paul Gordon.

Thomas J. Cahill, Asst. U. S. Atty. for Southern District of New York (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, Arnold N. Enker, Asst. U. S. Atty., on the brief, for appellee.

Before WATERMAN, FRIENDLY and SMITH, Circuit Judges.

FRIENDLY, Circuit Judge.

These appeals concern another episode in the fraudulent career of Kimball Securities, Inc., one phase of which has recently been recounted in United States v. Aronson, 48 F.2d 319 (2 Cir.1963). Indeed, the two trials sprang from the same indictment. A preamble to this charged, substantially in the language of § 17 of the Securities Act of 1933, 15 U.S.C. § 77q, that Kimball Securities, Inc., and numerous other persons, including Gordon and Ross, by the use of transportation and communication in interstate commerce and of the mails, employed a device, scheme and artifice to defraud, obtained money and property by untrue statements of material facts and omissions to state material facts necessary to make the statements not misleading, and engaged in transactions that operated as a fraud and deceit on purchasers of various securities, including common stock

of Mark, Inc. The trial of Gordon on three substantive counts and a conspiracy count and of Ross on two substantive counts and the conspiracy count was severed from that of the Aronsons. At the close of the Government's case, the judge dismissed two substantive counts against Gordon, one against Ross, and the conspiracy count against both. The remaining counts, which were submitted to the jury, were Count 3, charging Gordon and others with use of the mails to send a confirmation of a purchase of Mark, Inc. stock to Hazel, Mae & Sam King, Jr., in Conway, Arkansas, and Count 10, charging Ross and others with use of the mails to send a confirmation of a purchase of Mark, Inc. stock to William S. Mueller in Amherst, Mass., both acts alleged to be "in furtherance of said scheme and artifice to defraud." Verdicts of guilty, judgments of conviction, sentencing and appeals followed.

Kimball Securities, Inc. was a typical "boiler-room" operation. Joseph Kimball, its president and guiding light, who had pleaded guilty, gave a vivid description of its sales methods. The process would begin by sending to persons on various occupational lists, "such as doctors, plumbers, anything you want," which Kimball owned or would purchase, "teaser letters" describing the bright financial future afforded by low-priced stocks.[1] These were followed by sales literature touting some particular stock. Next would come a telephone call from a salesman called an "opener", who "would try and sell the prospect as much or as little as he could." This would be followed by more mail relating the "good news about the company," and then by the knock-out blow, a call from a "high-pressure salesman", colorfully characterized as a "loader", who would "try and increase the purchase of the stock."

One of the stocks to which Kimball turned its attention was that of Mark, Inc.; it arranged with one Cass, an officer of Mark, to sell this stock on a basis whereby the proceeds would be divided equally between Cass and Kimball. From July 21, 1958 to February 5, 1959, this was the only security—we rather hesitate to use that word—which Kimball sold; the price went from $1.50 to $2.35 per share; 258,000 shares were sold to 790 customers.

Sam King, a plumber living in Conway, Ark., testified that during July 1958, he received some literature from Kimball concerning Mark, Inc. About a week later he received a telephone call at his home, between 6 and 7 P.M. Central Standard Time, from a man who identified himself as Paul Gordon of Kimball Securities. A telephone company toll ticket established that on July 28, 1958, at 8:35 P.M. Eastern Daylight Saving Time (equivalent to 6:35 P.M. Central Standard Time), a call to King, lasting 20 minutes, was made from Gordon's home and charged to the Kimball number. King testified that the caller, who claimed he had been given King's name by a friend of King's, said that Kimball Securities had a block of shares in Mark, Inc. and he was getting some new customers, that Mark, Inc. "was an old reliable company and they were mining, and they were going to merge it with a helicopter firm, and the stock would double in probably thirty days, and that he would advise me when to sell and when to buy." King asked whether Kimball Securities was "anything like Merrill, Lynch, Pierce, Fenner & Beane." The caller, owning that "it was not as big an organization," said "it was just as reliable"; he also stated that if King didn't make any money, he couldn't either, and that he was staying late in his office to make calls to King and others. King bought 300 shares at $1.50 each. A man identifying himself as Gordon and having the same voice as the first caller telephoned later to urge further purchases. When King tried to sell the shares, he

---

1. One of these was headed "How a $65 a Week Teacher Made $1,000,000 in the Stock Market." *"The secret of his success"* was said to be "that he shunned investment grade issues in preference to speculative ventures in shares of little known companies."

was informed by a Little Rock brokerage firm that no takers could be found at a price of 40 cents. Gordon did not testify.

Gordon's appeal raises no questions of identification worthy of discussion, since the toll ticket was ample evidence to support a finding that he was the man who telephoned King. We shall discuss his claim of error in refusing to strike the testimony of the witness Gentzel when we come to Ross' appeal. His major contention is that there was insufficient evidence of violation of § 17 of the Securities Act because he was warranted in relying on the information about Mark, Inc. given him by his employer. We should have the greatest difficulty in accepting that argument on the facts here. Even though Gordon was employed at Kimball's for only seven working days, the five that had elapsed before his call to King should have sufficed to teach anyone, particularly a man like Gordon, who had previously worked for a respected securities firm, exactly what was going on; moreover, the "literature" on Mark prepared by Kimball was suspicious on its face to anyone with the slightest financial knowledge.[2] The evidence against Gordon was far more damning than what we have held sufficient in revocation proceedings, see Berko v. S. E. C., 316 F.2d 137 (2 Cir. 1963). We are not here required to determine how far the principles set forth in that and other decisions apply also in criminal prosecutions. For the jury was warranted in finding, under the proper instructions it received, that Gordon knowingly lied when he made statements to King which were not based on information supplied by Kimball, such as that he had gotten King's name from a friend, that Kimball Securities was "just as reliable" as Merrill Lynch, that he would make no money unless King did, and that he was staying late in the office to make the call. It would have been justified also in finding that when Gordon stated his expectation that the stock would double in price in thirty days, he was voicing a belief that did not exist (unless it was based on the expected results of Kimball's high pressure sales campaign, in which event he was omitting "to state a material fact necessary in order to make the statements made, in

2. The literature included an illustrated booklet whose cover contained a drawing of oil wells and oil tanks with the two words of the corporate title, "Mark, Inc." separated by a rocket; other "plates" were entitled "Imagination," "Brainstorming," "Experience," "Soundness," "Creative Thinking," "Vision," etc. Another sales item, "Kimball's Investment Notes," apologized for delay in the sending of "your 20 page, full color brochure" due to the "unprecedented demand"; it showed "Mark Annum Net Earnings" of 4.39¢ per share for the year ended March 31, 1958, which were to be expanded to a potential of 31.08¢.

Neither these exhibits nor still more important pieces of evidence, such as the telephone company toll ticket showing Gordon's call to King or the confirmation slips mentioned below, were included in "the original papers" transmitted by the clerk of the district court pursuant to F.R.Civ.Proc. 75(o), here applicable by virtue of F.R.Crim.Proc. 39(b) and our Rule 11; nor were they reproduced in the appendices required by our Rule 15(b), or submitted in accordance with the alternative procedure authorized by our Rule 16(a). This failure to make pertinent exhibits available to us, save by special request to counsel on our part, is by no means unique to this appeal. We get the testimony because it has been lodged with the clerk of the district court who sends it along, but generally, especially in criminal appeals, we do not receive exhibits that often are far more probative, because counsel have simply kept them and make no effort to have them sent to us. For a variety of reasons, it would seem desirable that exhibits of modest size pertinent to an impending appeal be lodged with the clerk of the district court so that he can forward them along with the transcript; the announced purpose of the reform embodied in F.R.Civ.Proc. 75(o) was to give "the appellate court the advantage of having before it the original papers just as they were presented to the trial court." Committee Note of 1946. Whether this has been done or not, exhibits which counsel desire us to consider are subject to our Rule 15(b) relating to appendices or to the alternative permitted by Rule 16(a).

the light of the circumstances under which they were made, not misleading"), and that when he agreed to advise King when to sell, he was making a statement he had no intention of carrying out. All these alleged misrepresentations were plainly frauds within statutes antedating § 17(a) (2), see Bentel v. United States, 13 F.2d 327, 329 (2 Cir.), cert. denied sub nom. Amos v. United States, 273 U.S. 713, 47 S.Ct. 109, 71 L.Ed. 854 (1926); Van Riper v. United States, 13 F.2d 961, 964–965 (2 Cir.), cert. denied sub nom. Ackerson v. United States, 273 U.S. 702, 47 S.Ct. 102, 71 L.Ed. 848 (1926); and within that section also, 3 Loss, Securities Regulation (2d ed. 1961) 1430–39, and authorities cited.[3]

Ross was in Kimball's employ for the last two weeks of November, 1958. The count against him that was submitted to the jury related to a call allegedly made to William S. Mueller, a research professor at the University of Massachusetts, which resulted in the sale of 100 shares of Mark, Inc. at $2.35 per share on November 26. The caller, identifying himself as Ross, told Mueller, who had previously received the "investment news letter" about Mark, that Mark "was a very sound investment, that he was quite certain that the stock would at least double in approximately six months, and that it might go as high as 10 to $14 a share within six months," and also that Kimball Securities "was a very reliable company, that they had hired stock analysts who were analyzing the various stocks so as to protect their customers." Ross testified that he could not remember whether or not he had called Mueller, that

he had studied Kimball's literature about Mark for almost a day and thought it was "a good security" and "should be selling at a higher price" if all the reports were true, and that he left Kimball principally because he found someone else at his desk and the prospect cards assigned to him strewn about. Postponing questions as to the application of the hearsay and best evidence rules in connection with the identification of Ross as Mueller's caller, we shall first deal with other points raised on his appeal.

Over consistent objection by defense counsel, the prosecutor subjected Ross to extensive cross-examination on his career as a stock salesman. He brought out that Ross was first employed in 1955, for two to three weeks, by Brown, Barton & Engel in Newark, which sold only one stock, Randex Uranium, Ross' sales being made by telephoning names supplied by the office; he was allowed to ask whether Ross told customers that Randex was a good speculation and that Ross believed the price would go up—questions that Ross answered in the affirmative although he knew "nothing about the operations at all"—and whether Randex or Brown, Barton & Engel were still in business, as to which Ross disclaimed knowledge. Further questioning took Ross to Golden, Dersth in New York, where, for five weeks, he sold "a few securities", also over the telephone, including American States Oil and "South something, a racing stock, but I can't recall the name of it"; to M. T. Schuck, where, for a few weeks, he sold Great Sweetgrass over the phone; to G. F. Rothschild, where for six months he made telephone sales of Great

3. Gordon complains also of slighting references to his trial counsel by the judge; the Government claims these were merited. While Gordon's trial counsel may not have exhibited all the forensic skills that might be desired, our reading of the cold record alone would not lead us to conclude that his conduct warranted the rebukes that were rather consistently administered to him. Although we realize how discouraging it must be for an experienced trial judge to see valuable time being lost or to hear questions that are improperly framed, it would be better to

address any necessary admonitions to counsel outside the hearing of the jury. However, we cannot believe that the remarks complained of were sufficiently prejudicial to call for reversal, in view of the strength of the Government's case against Gordon and of the fact that, unlike United States v. Brandt, 196 F. 2d 653 (2 Cir. 1952), and United States v. De Sisto, 289 F.2d 833 (2 Cir. 1961), which Gordon cites, the judge's comments here did not reflect on the defendant's case so much as on the way it was being handled.

Sweetgrass, Kroy Oil, and United Dye & Chemical; and to other firms, including Mack Robbins, Philip Newman & Associates, and Steven Randall, selling stocks over the telephone. He left several of these houses because they were being investigated by the SEC. He did not remember what stock he had sold at Steven Randall, giving negative answers when asked whether it could have been Swan-Finch or Doeskin Products; when asked whether it could have been Havana Racing, he thought "there was a Havana Racing now that I recollect, and then I recollect another company, I believe it was American Dryer." He admitted regularly telling his prospective customers that the stock he was selling was a "good speculation" and would go up in price—his reliance for this being on sales literature; questions as to whether the employer and the company were still in business elicited varying responses.

 Ross claims it was error to allow this cross-examination since it "insinuated prior misconduct." Of course it did, but, as the mere statement shows, the evidence was highly relevant. Evidence of "other crimes" is admissible "to show, by similar acts or incidents, that the act on trial was not inadvertent, accidental, unintentional or without guilty knowledge." McCormick, Evidence (1954), at 329. "The prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent." 2 Wigmore, Evidence (3d ed. 1940), at 200. Furthermore, "when the crime charged involves the element of knowledge, intent, or the like, the state will often be permitted to show other crimes in rebuttal, after the issue has been sharpened by the defendant's giving evidence of accident or mistake, more readily than it would as part of its case in chief at a time when the court may be in doubt that any real dispute will appear on the issue." McCormick, supra, at 331. Here Ross had sought in his direct testimony to depict himself as an unwitting tool in Kimball's iniquitous venture; it was wholly proper for the Government to rebut this claim of ignorance and innocence by showing that Ross had long drifted among houses selling similarly worthless stocks by similar methods. The case is so totally different from United States v. Provoo, 215 F.2d 531, 534–537 (2 Cir. 1954) and others cited by Ross that discussion of them would be superfluous.[4]

4. Much ink has been spilled in the briefs and appendices over an episode in Ross' cross-examination where the transcript shows the following at the close of the examination in regard to his activity at Steven Randall:

"Q. Is American Dryer still in business? A. I believe they are but I am not sure.

"Q. I won't ask you about Swan-Finch now.

"Mr. Berman: I don't understand that comment, your Honor.

"The Court: Evidently you have not read the newspapers.

"Mr. Berman: No, I have not.

"The Court: Perhaps it is just as well, then.

"Mr. Berman: All right, your Honor, excuse me."

After Ross had filed his brief in this Court alleging particuar prejudice because of this mention of Swan-Finch, the Government moved in the District Court, under F.R.Civ.Proc. 75(h) and F.R.Crim.Proc. 39(b)(1), to correct the record to substitute "Havana Racing" for "Swan-Finch." After considering the reporter's affidavit that he was certain the reference was not to Swan-Finch, although he didn't know how those words got transcribed; defense counsel's affidavit that in his recollection "Mr. Morrison [the prosecutor] mentioned Swan-Finch" and that Morrison had told him he wasn't sure which name he had mentioned and the reporter wasn't sure either; and Morrison's affidavits that in his recollection he said "Havana Racing," that he never told defense counsel he wasn't sure what he said but rather that he was sure he said "Havana Racing," and that he never told defense counsel he had discussed the matter with the court reporter, Judge Dawson granted the Government's motion, stating that he had "a distinct recollection that the reference was not to Swan-Finch but to Havana Racing" and calling attention to the occurrence of the episode on October 31, 1962, a date during the Cuban crisis when "anybody acquainted with the news-

Perry H. Gentzel, an engineer residing at State College, Pa., was a victim of Kimball's promotion of Mark on a larger scale than King or Mueller. He testified that in the latter part of November, 1958 (four months after Gordon had left Kimball's but during Ross' employment there), he received a number of calls from a Kimball salesman who identified himself as Norman Thomas, and made the usual optimistic comments about Mark, Inc., including a statement that it would be listed on the stock exchange. These led to purchases totalling 9,100 shares, some at $1.95 and others at $2.35 per share. Gentzel admitted that he had never talked to anyone who identified himself as Ross, and the Government did not seek to rest admissibility on the theory that "Norman Thomas" was a fictitious name used by Ross, although a telephone company witness testified to a call made from the Kimball office to Gentzel on November 25 by a party giving the name of Ross and there was evidence that Kimball had never employed a "Norman Thomas". The theory of admissibility seems rather to have been that the indictment charged a scheme and artifice to defraud and that Gentzel's testimony tended to show the existence of a scheme on the part of Kimball Securities and its salesmen. At the conclusion of Gentzel's testimony the judge said in the jury's presence that he didn't think that "it adds very much as to these two defendants. It does add to the general effect but the general effect has been well established by Mr. Kimball * * *." However, on the next morning, after his dismissal of the conspiracy count, he denied a motion to strike Gentzel's testimony.

 A charge of a "device, scheme, or artifice to defraud" does not require proof of participation by more than one person. Pereira v. United States, 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954). On the other hand, a "scheme" involves some connotation of planning and pattern, and it is hard to doubt that evidence showing that the conduct charged to a defendant followed a pattern of fraud similar to one that was being contemporaneously practiced by a fellow employee, or even that was followed later by another employee of the same house with respect to the same stock, has enough logical bearing to pass the test of relevancy. Despite the dismissal of the conspiracy count, the evidence would seem to have been admissible as the act of a co-conspirator if the judge had determined, as he properly might have, that "evidence, other than that whose admissibility is under challenge, disclosed" a conspiracy. United States v. Annunziato, 293 F.2d 373, 378 (2 Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed.2d 134 (1961), and cases cited; Reistroffer v. United States, 258 F.2d 379, 387 (8 Cir. 1958), cert. denied, 358 U.S. 927, 79 S.Ct. 313, 3 L.Ed.2d 301 (1959). The amount of proof *aliunde* as to the existence of a conspiracy that is required to render such evidence admissible is not as high as the amount needed to warrant submission of a conspiracy charge to the jury. See United States v. Nardone, 127 F.2d 521, 523 (2 Cir.), cert. denied, 316 U.S. 698, 62 S.Ct. 1296, 86 L.Ed. 1767 (1942). And since the utterances of "Norman Thomas" were offered as acts rather than as declarations, their admissibility against Gordon would not be destroyed by Gordon's previous withdrawal from the conspiracy. Lutwak v. United States, 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593 (1953). It is true that the judge did not rest his ruling on this theory; after saying that "It takes more than that [the

---

papers would know that Havana Racing was not a going concern." We fully accept Judge Dawson's recollection, which in addition to all else, fits the context of the questioning better than the transcript as written. But if the case were otherwise, we would still fail to perceive how mere repetition of a reference to

Swan-Finch, which had elicited no objection when first made and provoked no request for action by the judge on the alleged repetition, see United States v. Agueci, 310 F.2d 817, 836–838 (2 Cir. 1962), could constitute a sufficient ground for reversal.

Government's evidence] to prove a conspiracy," he ruled simply that "Gentzel's testimony to the extent it is relevant will remain in the record." Still we should hardly be warranted in reversing for the admission of evidence simply because the judge did not place his ruling on the ground that would most readily have supported it. Moreover, we see no reason why the admissibility of relevant "acts," as distinguished from declarations, of an associate need rest on the existence of a conspiracy, since no hearsay problem is involved. See Roe v. United States, 316 F.2d 617, 622–625 (5 Cir. 1963). Finally, even if we should be wrong in all of this, admission of the evidence was not so prejudicial as to call for reversal. In the presence of the jury, the judge had made not only the statement quoted above but a number of other remarks as to the lack of force in Gentzel's testimony as against Gordon and Ross; he would doubtless have included a limiting instruction on this subject in his charge if requested to do so.

 This brings us to the serious issues raised in Ross' appeal. The fact that the man who phoned Mueller identified himself as Ross was not sufficient to permit the jury to infer that Ross was the caller. 7 Wigmore, Evidence, supra, at 617. The Government sought to supply the needed additional evidence in several ways. Walter Gairing, who lived in Wadsworth, Ohio, testified that on or about November 19, 1958, he had received a call in the early evening concerning Mark, Inc. from a Kimball salesman who identified himself as Ross; telephone company records showed a call to Gairing's number from Kimball Securities by a person named Ross at a corresponding hour on November 18. Both Mueller and Gairing identified confirmation slips in which there was typed in a blank after the word "Salesman" the number "24". Then Kelly, an investigator for the SEC, testified that in January, 1959, he visited the Kimball office and asked the cashier, Sussman, to identify the numbers that the salesmen used; that Sussman "pointed to a list

that was on the side of the cage, the cashier's cage, and it showed the numbers and the salesman who was assigned to that particular number on the list"; and that number 24 was assigned to Ross. This evidence, along with the inference from Ross' failure to deny that he called Mueller and Gairing or that his number was 24, was clearly sufficient, N. Sims Organ & Co. v. S. E. C., 293 F.2d 78, 80–81 (2 Cir. 1961), cert. denied, 368 U.S. 968, 82 S.Ct. 440, 7 L.Ed.2d 396 (1962), if Kelly's testimony was admissible.

 Ross contends that admission of the testimony violated both the hearsay rule and the best evidence rule. It is plain enough that Kelly's testimony about Sussman's pointing to the list was not outside the hearsay rule merely because Sussman used no words; the pointing was as much a communication as a statement that "This is a list of the names and numbers of the salesmen" would have been. See Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L.Rev. 177, 190–92 (1948). But Ross' trial counsel, although he had objected on the ground of hearsay when Kelly was first interrogated concerning his request that Sussman identify the numbers the salesmen used, did not repeat the hearsay objection when Kelly testified to the pointing. We would not wish to rely on what may seem so technical a point were it not that the objection itself is so technical and that the failure to repeat the hearsay objection, when coupled with the vigorous objection on other grounds, may well have distracted the judge's attention from the hearsay problem; if objection had been properly raised, this problem very likely could have been met by recalling Sussman. In any event, Kelly's testimony about the list itself, the character of which was indeed not disputed, would seem sufficient non-hearsay evidence to establish the meaning of that document—if such testimony was not barred by the best evidence rule; any hearsay error would therefore not be prejudicial.

Counsel did object "On the ground that the list is the best evidence, and it will speak for itself, and the proper foundation has not been laid to indicate whether the list was valid or a legitimate list, whether the list was in fact a part of the broker's business or the business of the salesmen." The judge thereupon asked Kelly, "Have you got that list or was it left there?" Kelly answered, "It was left there, but I took down information including the names and the numbers," after which the judge said "I think that is sufficient to lay the foundation" and permitted Kelly to testify as to salesmen's numbers on the list, including Ross'.

■ This evidence, offered to prove the contents of a writing, was within the best evidence rule, 4 Wigmore, supra, §§ 1178, 1183, and the reasons for it. Id. § 1179. Production of the list was therefore required unless it was not feasible. Id. § 1192. The proper procedure was for the Government to seek to establish from Kelly, Sussman, or Kimball that the list no longer existed in the fall of 1962 when the case was tried; we cannot understand why this was not done. But there had been testimony that the Kimball firm had gone out of business in February, 1959, and the judge was evidently convinced that a paper of so little permanent value as the list in the cashier's cage would not be available more than three and a half years later. Much less of a search is required to permit the use of secondary evidence when "the subject of inquiry [is] a useless paper, which may reasonably be supposed to be lost. * * *" Brewster v. Sewell, 3 B. & Ald. 296, 299, 106 Eng.Rep. 672, 673 (1820). Moreover, great deference is accorded to the trial judge's determination of this issue of feasibility. McCormick, supra, at 414; Galbreath v. United States, 257 F. 648, 658 (6 Cir. 1918); indeed, Wigmore urges that the issue "should be left entirely to the *trial Court's discretion.*" Vol. 4 at 340. It can be argued that these authorities relate only to cases where there was some evidence of a search whereas here there

was none. But we would think it an undue formalism to reverse Ross' conviction because of a possible violation of this merely preferential rule of evidence under the circumstances here presented— where the probabilities that the paper no longer existed are in fact so strong, the "writing" being proved was so simple, there was no ground for suspecting the accuracy or good faith of Kelly's observation, and Ross, who testified on his own behalf, did not even question that 24 was his number.

Affirmed.