UNITED STATES of America,
Plaintiff-Appellee,

v.

Kenneth KLEIN, Defendant-Appellant.

No. 207, Docket 28338.

United States Court of Appeals
Second Circuit.

Argued Nov. 20, 1964.

Decided Jan. 21, 1965.

Peter K. Leisure, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for Southern District of New York, Andrew T. McEvoy, Jr., and John S. Martin, Jr., Asst. U. S. Attys., New York City, on the brief), for plaintiff-appellee.

Phylis Skloot, New York City (Anthony F. Marra, New York City, on the brief), for defendant-appellant.

Before LUMBARD, Chief Judge, and MEDINA and MARSHALL, Circuit Judges.

MEDINA, Circuit Judge.

On November 2, 1962, the hotel room of Siegbert Katz, a visitor to the United States, was burglarized. Part of the loot consisted of 32 Bank of America Travelers Cheques, which Mr. Katz, following normal procedure, endorsed at the time of purchase while leaving blank countersignature lines to be filled in by Mr. Katz when the cheques were negotiated. Eight of the cheques were for $50, the remainder for $10. Five days after the burglary the cheques were negotiated in

548

three banks located in downtown New York; they were subsequently received for payment by the Bank of America's San Francisco office.

Three detectives on the Manhattan Burglary Squad observed the activities of appellant Kenneth Klein and his friend, Martin Bluver, on November 7, 1962. In substance, their testimony was that Klein entered a bar on 23rd Street at about 11:00 A.M. and was joined approximately half an hour later by Bluver. The two remained in the bar until 1 o'clock when they walked to a nearby bank. Klein was seen talking to a teller while Bluver, standing a few feet behind Klein, looked towards the rear and door of the bank. No cheques were negotiated in this bank and Klein and Bluver left within five minutes of their arrival. The next stop was another 23rd Street bank where Klein and Bluver conversed while the latter waited on line. Bluver appeared to be holding travelers cheques, none of which were negotiated in this bank.

After a taxicab ride to 14th Street and Second Avenue, Klein and Bluver entered a third bank. A few moments later Klein emerged from the bank while Bluver remained inside in an unsuccessful attempt to negotiate some of the cheques. They immediately went to a fourth bank where Bluver began talking to a bank employee and Klein seated himself several feet away. Klein then approached Bluver and spoke briefly with him. Shortly thereafter Bluver negotiated $250 worth of the stolen cheques, forging the necessary countersignature of Siegbert Katz. Klein and Bluver then adjourned to a nearby bar where they spent about ten minutes in conversation before moving on to the next bank.

Klein waited outside the fifth bank where Bluver succeeded in cashing another $110 of the stolen cheques. They spent the next twenty minutes in a coffee shop and then both entered a sixth bank where no cheques were negotiated. The remaining cheques totalling $280 were cashed in the seventh and last bank. In this bank, Bluver was observed at a writing table while Klein stood off to one side looking around the bank. Upon leaving this bank, Klein and Bluver exchanged money; Klein was seen to give money to Bluver and Bluver to give money to Klein.

Bluver, who pleaded guilty to the charge of illegal interstate transportation of forged securities, was called as a witness by the Government. He completely exonerated Klein and midway through his testimony was declared a hostile witness. The gist of his story was that he had arranged to meet Klein at the 23rd Street bar to celebrate his forthcoming marriage and attend the races at Aqueduct. Upon leaving the bar in a drunken state occasioned by the consumption of ten or more drinks apiece, Bluver recalled that he lacked sufficient funds for the racetrack expedition and requested Klein to accompany him while he cashed some cheques. Bluver professed an inability to recall whether Klein actually went into any of the banks with him, but emphatically denied that Klein had any idea that the cheques were stolen or forged or that Klein had ever seen the cheques. Klein did not testify.

Towards the end of its case, the Government called Sidney Kastner to the stand. Kastner's testimony, strenuously objected to at the trial, presents the principal contention before us for review. It was to the effect that in December 1960 Klein told him that he had access to stolen travelers cheques and proposed that Kastner, in consideration of a share of the proceeds, arrange their negotiation by forging the necessary countersignatures. Kastner continued that during the period between December 1960 and August 1961, he received stolen cheques from Klein on some fourteen or fifteen occasions, that Kastner cashed these cheques and split the proceeds with Klein on a 50–50 basis. Immediately before and after Kastner's testimony and in his charge to the jury, Judge Tyler carefully instructed the jury that Kastner's testimony was admissible only for the purpose

of proving Klein's unlawful knowledge or intent and not "as proving the actual acts here on trial."

■ We think it clear that Judge Tyler properly exercised his discretion in admitting Kastner's testimony. See, e. g., United States v. Blount, 2 Cir., 1956, 229 F.2d 669, 671–672; United States v. Gannon, 2 Cir., 1957, 244 F.2d 541; Kowalchuk v. United States, 6 Cir., 1949, 176 F.2d 873, 877–878; United States v. Schiller, 2 Cir., 1951, 187 F.2d 572, 574–575; United States v. Stadter, 2 Cir., 1964, 336 F.2d 326, 328–329 and cases cited therein; United States v. Stirone, 3 Cir., 1958, 262 F.2d 571, 576–577, reversed on other grounds, 1960, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252; United States v. Marquez, 2 Cir., 1964, 332 F.2d 162, 166, cert. denied, 85 S.Ct. 162 (1964); cf. Enriquez v. United States, 9 Cir., 1963, 314 F.2d 703, 716–717. See generally 2 Wigmore, Evidence, Sections 302, 316 (3rd ed. 1940).

In at least two very recent cases we have upheld the introduction into evidence of prior similar offenses for the purpose of establishing knowledge or intent or negativing a proffered claim of innocence. As Judge Irving R. Kaufman stated in United States v. Robbins, 2 Cir., 1965, 340 F.2d 684:

> "The rule which permits the introduction of evidence respecting similar offenses for this limited purpose is based on the sound recognition that when there exists a pattern of misrepresentations, closely related in time and subject matter, it is reasonable to believe that they were not made innocently. As Wigmore so succinctly wrote, 'The argument here is purely from the point of view of the doctrine of chances,—the instinctive recognition of that logical process which eliminates the element of innocent intent by multiplying instances of the same result until it is perceived that this element cannot explain them all.' 2 Wigmore, Evidence § 302."

See also United States v. Rosenblum, 2 Cir., 1964, 339 F.2d 473.

■ Where, as here, the evidence is susceptible of the interpretation that the acts alleged to constitute the crime were innocently performed and the vital issues of knowledge and intent are keenly disputed, it is well within the trial judge's discretion to permit the Government, on a properly limited basis, to introduce evidence of prior similar offenses demonstrating the unlikelihood that the defendant was a mere innocent, unknowing bystander. For in such cases the jury must be relied upon not to convict the defendant solely because he is an evil fellow with a propensity towards criminal behavior in general, cf. Michelson v. United States, 1948, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168, but because of the sheer improbability that a person with his familiarity and experience with the specific criminal conduct charged might have been unaware that a crime was being committed or might have performed the acts with an innocent and lawful intent.

As applied to the facts of this case the principle is clear and compelling. Many innocent persons might accompany their friends to one, two or even seven banks without realizing that their companion was in the process of attempting to negotiate forged cheques. And they might likewise engage in an exchange of money. However, it would be wholly unrealistic to assume that a person such as Klein, who had previously engaged in the business of cashing forged cheques, would not have surmised from Bluver's activities that a forgery was being perpetrated in at least some of the seven banks they visited or that he had no interest in the venture. The evidence being so highly relevant to the issues of knowledge and intent, it was therefore admissible notwithstanding the possibility that the jury might have used the evidence in a prejudicial manner contrary to Judge Tyler's careful instructions.

■ We have carefully considered appellant's contentions that the evidence was insufficient to establish that he aided and abetted Bluver, that the prosecutor improperly utilized Bluver's testi-

mony, and that the trial judge erroneously admitted certain evidence and incorrectly charged the jury. As we find these arguments clearly without merit, we think there is no reason for further discussion.

We thank Phylis Skloot of the Legal Aid Society for her able and forceful presentation of appellant's case.

Affirmed.