**UNITED STATES of America**

v.

**John W. CLARK et al.**

**Crim. No. 73–471.**

United States District Court,
E. D. Pennsylvania.

July 14, 1975.

Andrew G. Gay, Philadelphia, Pa., for defendant John W. Clark.

Harold L. Randolph, Philadelphia, Pa., for defendant William Christian.

Harry R. Seay, Philadelphia, Pa., for defendant John Griffin.

## OPINION AND ORDER

FOGEL, District Judge.

On November 22, 1974, John W. Clark, William Christian, and John Griffin were found guilty by a jury on four counts charging them with conspiracy, (18 U.S.C. § 371), and aiding and abetting violations of the federal bank robbery statute, (18 U.S.C. §§ 2, 2113).[1] Each defendant has now filed motions which seek, in the alternative: (1) dismissal of the indictment based upon excessive pretrial delay; (2) a judgment of acquittal, under Rule 29 of the Federal Rules of Criminal Procedure; (3) a new trial, under Rule 33 of the Federal Rules of Criminal Procedure; or (4) arrest of judgment, under Rule 34 of the Federal Rules of Criminal Procedure.

In his original motions, Clark asserted 41 separate grounds in support of the relief sought; Christian and Griffin each asserted 34 such grounds. At this juncture, however, the defendants among them press only 16 separate contentions, which may be categorized as follows: (1) pretrial motions, ruled upon by the Court prior to trial but renewed thereafter; (2) challenges to the manner of jury selection; (3) rulings of the Court during trial; (4) the instructions of the Court to the jury; and (5) the legal sufficiency of the evidence to support the jury's verdict.[2] We shall discuss these contentions *seriatim*.

Jeffrey M. Miller, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

1. A co-defendant, Richard Dabney, was found guilty by a jury on May 31, 1974. Dabney's post-trial motions were denied in an earlier Opinion and Order of this Court, reported at 393 F.Supp. 529 (D.C.Pa.1975). Dabney's conviction is now on appeal before the United States Court of Appeals for the Third Circuit (No. 75–1431).

2. Even though we shall limit our discussion to the sixteen grounds now asserted by defendants in support of their motions, we have carefully examined all of the grounds originally set forth, and find them to be utterly without merit. We conclude that the case was properly submitted to the jury, under the standard of *United States v. Sutton,*

## I. *Pretrial motions*

Defendants now challenge our rulings on pretrial motions in which they sought: (1) dismissal of the indictment based upon their contentions of excessive pretrial delay; (2) a severance; and (3) a change of venue. Each of these motions was denied prior to trial. After a review of the record, and the restatement of the position of defendants by their counsel in the post-trial motions and briefs in support of those motions, we reaffirm our original decision for the reasons hereinafter set forth.

### 1. *Pretrial delay.*

On November 1, 1974, after extensive pretrial hearings, the Court denied the motions of Clark, Christian, and Griffin to dismiss the indictment based upon pretrial delay, and delivered oral findings of fact and conclusions of law with respect to those matters. We shall review the substance of those findings and conclusions.

The factual framework upon which we based our conclusions may be summarized as follows:

1. On February 8, 1973, incidents occurred at the home of Ernest Kelly, Sr., 5769 Kemble Avenue, Philadelphia, Pa., and at the Continental Bank, Broad Street and Nedro Avenue, Philadelphia, Pa., from which arose the instant federal prosecution. Christian and Griffin were arrested inside the Kelly home on the afternoon of February 8, 1973; Clark was not arrested on that date.

2. On or about March 1, 1973, at a meeting in Philadelphia between representatives of the United States Attorney's office, Washington, D. C., and the Philadelphia Police Department, the name of John Clark was suggested as a suspect in the February 8, 1973 incident.

3. On March 16, 1973, Ernest Kelly, Sr., and Thelma Kelly, his wife, were shown a photospread by Detective English of the Philadelphia Police Department; each identified the photograph of John Clark, who was still at large, as the fifth man involved in the February 8, 1973 incident. Detective English thereupon swore out a complaint against Clark on state charges including aggravated robbery, kidnapping, conspiracy, burglary, violation of the Uniform Firearms Act, and carrying a concealed deadly weapon. Later that day, arrest and search warrants were signed by Municipal Court Judge Edward T. Quinn, and Clark was arrested by Detective English.

4. On March 20, 1973, Clark began serving a fifteen year sentence imposed by Judge Ditter of this Court in an unrelated case, Criminal No. 71–163.

5. On March 21, 1973, Assistant United States Attorney Percy H. Russell, Jr., of the office of the United States Attorney in Washington, D. C., presented the testimony of Ernest and Thelma Kelly to a grand jury in Philadelphia. Both of the Kellys testified with respect to the participation of Clark in the incident of February 8, 1973.

6. On July 11, 1973, unindicted co-conspirator Thomas Clinton died, apparently of natural causes.

7. On August 24, 1973, the indictment in the instant case was lodged against the defendants.

8. On September 5, 1973, Herbert Fisher, Esq., was appointed to represent Clark in these proceedings. Fisher entered his appearance on September 12, 1973.

9. On September 5, 1973, Christian and Griffin failed to appear for arraignment on the indictment.

10. On September 25, 1975, Jeffrey Miller, Esq., the Assistant United States Attorney charged with the prosecution of this case, wrote to Fisher and suggested the possibility of a conflict in Fisher's representation of Clark, because

138 U.S.App.D.C. 208, 426 F.2d 1202, 1210 (1969) and *United States v. Allard*, 240 F.2d 840, 841 (3d Cir. 1957), and that a new trial is unwarranted, *United States v. Leach*, 427 F.2d 1107, 1111 (1st Cir. 1970), cert. den. 400 U.S. 829, 91 S.Ct. 57, 27 L.Ed.2d 59.

Richard Dabney, a co-defendant, was represented in another criminal action in this Court by Herman Bloom, Esq., a partner of Fisher.

11. On September 28, 1973, Edward H. Weis, Esq., appointed counsel for Dabney, advised the Court in writing that the Defender Association of Philadelphia, with which Weis was associated, represented Clark in another matter which was the subject of a petition under 28 U.S.C. § 2255.

12. Between September 28 and October 1, 1973, Fisher withdrew as counsel for Clark because of potential conflict.

13. On October 1, 1973, Andrew Gay, Esq., was appointed to represent Clark. Gay filed an entry of appearance on October 3, 1973.

14. On October 3, 1973, Miller notified the Court in writing that William Christian and John Griffin had been arrested by the Federal Bureau of Investigation in Jacksonville, Florida.

15. On that same date, Weis wrote to the Court requesting a continuance of the trial date from October 29, 1973, when it was originally scheduled, until a date after November 12, 1973, because of Weis' impending marriage and wedding trip. A copy of this letter went to Fisher, but not to Gay, whose entry of appearance was filed on the same day the letter was written.

16. At some time between October 3 and October 28, 1973, Robert Meistering, Deputy Clerk of this Court, telephoned Gay and continued the trial as to Dabney and Clark. Gay did not formally object to this continuance, which was at the request of Weis, then counsel of record for Dabney.

17. On or about October 12, 1973, Christian and Griffin, who had been apprehended in Jacksonville, Florida, were taken to the District of Columbia, where they faced murder charges.

18. On October 25, 1973, this Court appointed Charles Burr, Esq., to represent Christian, and David Creskoff, Esq., to represent Griffin.

19. At some time between October 25, and October 29, 1973, Charles Burr, Esq., withdrew due to a conflict; between October 25 and November 7, 1973, David Creskoff, Esq., also withdrew.

20. On October 29, 1973, Eugene Clarke, Esq., was appointed to represent Christian, but declined this appointment prior to November 7, 1973, because of his previous representation of Ernest Kelly.

21. On November 7, 1973, James Binns, Esq., and Mark Dolin, Esq., were appointed to represent Christian and Griffin, respectively.

22. On November 10, 1973, Fred Davis died. Davis was purportedly an exculpatory witness in this matter.

23. On November 15, 1973, Clark wrote a letter to this Court, which the government concedes to be a request for a speedy trial (N.T. 93, June 26, 1974).

24. In late November or early December, 1973, the prosecuting authorities in the District of Columbia asked for a continuance of the murder case scheduled to be tried in that forum; the case was continued from January to February, 1974.

25. On December 5, 1973, Christian and Griffin were arraigned before Magistrate Leomporra on the instant indictment. Both defendants stood mute during the arraignment, and not guilty pleas were accordingly entered as to each.

26. On December 13, 1973, Clark wrote to this Court to request a speedy trial.

27. On December 21, 1973, Christian and Griffin wrote to this Court from the Baltimore City Jail stating that they had refused to consult with their appointed counsel because they were not given sufficient time, and also stated that their lawyers did not have proper identification. They asked to be brought to Philadelphia for assignment of counsel and preparation of their defense.

28. On December 25, 1973, Clark wrote to this Court requesting a speedy trial; the letter was mailed on December 28, 1973.

29. In the latter part of December, 1973, Lonny Anderson, purportedly an exculpatory witness in this matter, died.

30. On January 22, 1974, Clark wrote to Chief Judge Lord of this Court requesting a speedy trial, and sent a copy of that letter to us.

31. On January 28, 1974, we wrote to Chief Judge Lord stating, *inter alia*, that Christian and Griffin did not wish to be represented by Binns and Dolin, and that these attorneys accordingly sought to withdraw; that the trial of Clark had been continued due to the arrest of Christian and Griffin in Florida, because the four defendants could be tried together; that the Washington, D. C., trial had been continued until February 11, 1974; and that the Dabney trial had been specially listed for February 19, 1974.

32. On February 11, 1974, pretrial hearings began in the Washington, D. C., case involving Clark, Christian, and Griffin; the trial commenced one week later.

33. In the middle of April, during the Washington, D. C., trial, we asked Jeffrey Miller, Esq., to contact the Assistant United States Attorney prosecuting that case for the purpose of determining whether Christian and Griffin had counsel in the instant case, or if they desired to have counsel appointed by us.

34. On April 25, 1974, Miller wrote to this Court stating that Christian and Griffin had refused to discuss the selection of counsel in this matter with the prosecuting Assistant United States Attorney, and had instructed their attorneys representing them in that forum to refrain from taking any part in such selection.

35. On May 2, 1974, we appointed Harold Randolph, Esq., to represent Christian, and Ronald Brockington, Esq., to represent Griffin.

36. On May 9, 1974, Brockington withdrew from representation of Griffin.

37. On May 13, 1974, Ronald McCaskill, Esq., was appointed to represent Griffin. Four days later, before McCaskill had commenced his representation of Griffin, he was relieved of this appointment and thereafter appointed to represent Dabney, whose trial was then in progress.

38. On May 17, 1974, the trial of Clark, Christian, and Griffin in Washington, D. C., concluded with guilty verdicts against each of these defendants.

39. On May 23, 1974, Harry Seay, Esq., was appointed to represent Griffin.

40. On June 6, 1974, we held a meeting in Chambers attended by Jeffrey Miller, Esq., the prosecuting Assistant United States Attorney; Andrew Gay, Esq., counsel for Clark; Harry Seay, Esq., counsel for Griffin; and Harold Randolph, Esq., counsel for Christian. Trial was scheduled for July 12, 1974.

41. On July 5, 1974, the United States Attorney's office notified us that a letter had been received from Samuel Dershaw, M. D., recommending a three-month postponement of the trial because of the delicate health of the Kellys.

42. On July 10, 1974, we held a hearing, and testimony was taken from Dr. Dershaw, and from Ernest Kelly, Sr. The trial was continued until October 7, 1974.

43. On September 7, 1974, Emily Jackson, apparently also known as Emily Burnett, died. On October 1, 1974, James Kennedy also died. Clark contends that these persons would have appeared as exculpatory witnesses.

44. On October 7, 1974, hearings on pre-trial motions were held in open Court. When Ernest Kelly testified that he had been subjected to threats with respect to his appearance as a prosecu-

tion witness the trial was continued, and we ordered an investigation to be undertaken by authorized federal agencies.

45. On October 21, 1974, pretrial hearings resumed; the pretrial motions were adjudicated; thereafter the trial commenced on November 4, 1974, and culminated in a guilty verdict which was returned by the jury on November 22, 1974.

In conformity with the relevant case law, we shall separately discuss the claims with respect to asserted delay *before* and *after* the federal indictment. Since we have extensively reviewed the law in this area in the prior Opinion and Order denying Dabney's motion for a new trial, 393 F.Supp. 529 (D.C.Pa., 1975), we will limit our discussion to the broad contours of the law as they have evolved in this area.

### a. *Pre-indictment delay*

■■ The Sixth Amendment right to a speedy trial does not attach prior to indictment or arrest, *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). Similarly, the provisions of Rule 48(b) of the Federal Rules of Criminal Procedure are clearly limited to post-arrest situations, *United States v. Marion, supra,* 404 U.S. at 319, 92 S.Ct. 455, *United States v. Dukow,* 453 F.2d 1328 (3d Cir. 1972), cert. den. 406 U.S. 945, 92 S.Ct. 2042, 32 L.Ed.2d 331.

■ An arrest on state charges, under the circumstances presented by this case, does not trigger any Sixth Amendment rights with respect to federal

charges which may follow. "It would be absurd in the extreme if an arrest on one charge triggered the Sixth Amendment's speedy·trial protection as to prosecutions for any other chargeable offenses", *United States v. DeTienne,* 468 F.2d 151, 155 (7th Cir. 1972), although "if the crimes for which a defendant is ultimately prosecuted really only gild the charge underlying his initial arrest and the different accusatorial dates between them are not reasonably explicable, the initial arrest may well mark the speedy trial provision's applicability as to prosecution for all the interrelated offenses", *Id.* at 155. In the instant case, the state charges included aggravated robbery, kidnapping, conspiracy, burglary, violation of the Uniform Firearms Act, and carrying a concealed deadly weapon, some or all of which offenses could clearly be completed by acts which took place at or near the Kellys' home, and are thus independent of the federal bank robbery offense which constitutes the basis for the instant indictment.[3]

Nor does an arrest on state charges trigger the provisions of Rule 48(b), which provide for dismissal "[i]f there is unnecessary delay in presenting the charge to the grand jury or in filing an information *against a defendant who has been held to answer to the district court*" (emphasis added).

Thus, Clark, Christian, and Griffin can have no claims based upon the Sixth Amendment's speedy trial guarantee, nor upon Rule 48(b), for the period from February 8, 1973, the date of the incident, until August 24, 1973, the date of the instant indictment.[4]

3. The instant case is thus distinguishable from *United States v. Cabral,* 475 F.2d 715, 717–718 (1st Cir. 1973), in which a state policeman arrested the defendant for possession of a sawed-off shotgun and possession of stolen property, although he was ultimately arraigned on a charge of grand larceny, which was later dismissed. Three days after the arrest, the sawed-off shotgun was turned over to federal authorities, who waited fifteen months to seek an indictment under 26 U.S.C. § 5861(i). Under these circumstances, and the substantial identity of

the charge on arrest and at the ultimate federal prosecution, the Court concluded that the speedy trial guarantee attached at the time of initial arrest. In the instant case, however, in which the federal charges do not in any sense "gild the charge[s] underlying [the] initial arrest", *United States v. DeTienne, supra,* 468 F.2d at 155, this reasoning is inapplicable.

4. As noted, Christian and Griffin were arrested inside the Kellys' home on February 8, 1973. Clark was arrested by Detective English on March 16, 1973.

■ *United States v. Marion*, however, does permit claims based upon the Due Process clause of the Fifth Amendment for the pre-indictment period. *Id.*, 404 U.S. at 324, 92 S.Ct. 455. As we interpret *United States v. Dukow, supra,* 453 F.2d at 1330, *either* substantial prejudice to a defendant's right to a fair trial, *or* delay as an intentional device by the prosecution to gain a tactical advantage over the accused, must be shown in order to make out a due process violation under the criteria of *United States v. Marion.*

We stated in our oral findings and conclusions delivered on November 1, 1974 that there is not a scintilla of evidence in this record that the pre-indictment delay was "an intentional device to gain tactical advantage over the accused", *United States v. Marion, supra,* 404 U.S. at 324, 92 S.Ct. at 465; hence, the only ground which would warrant dismissal of the indictment is that of substantial prejudice to the rights of these defendants to a fair trial.

■ At the pretrial hearings in this case, defendants' primary claim of prejudice pertained to the death of unindicted co-conspirator Thomas Clinton, which occurred July 11, 1973, between the arrest of defendants on state charges and the federal indictment. We rejected this claim at the conclusion of the pretrial hearings, and we reject it now for the following reasons:

*First:* At the time of Clinton's death, a mere five months had elapsed since the events of February 8, 1973, and four months since the arrest of Clark on March 16, 1973. The government simply could not be accused of inordinate delay at this point. See *United States v. Anderson,* 471 F.2d 201, 203 (5th Cir. 1973).

*Second:* Clinton could not have been compelled to testify in these proceedings, had he chosen to assert his Fifth Amendment privilege against self-in-crimination. See *United States v. Lane,* 465 F.2d 408, 412 (5th Cir. 1972). Clinton was named as an unindicted co-conspirator, rather than a co-defendant, *only* because he died prior to the federal indictment. Even if Clinton had lived, and was not named in the federal indictment, he could clearly have claimed his Fifth Amendment rights with respect to possible state prosecution.

*Third:* There is no evidence of any agreement on the part of Clinton to waive his Fifth Amendment rights and to testify in these proceedings. There are no statements by Clinton, exculpatory or otherwise, in the possession of defendants, their counsel, or the government. Indeed, there is no independent evidence of any kind, other than the obviously self-serving statements of these defendants, that Clinton could or would exculpate them. Moreover, Clinton was alive for several months after the state arrest, and yet no evidence was presented which would demonstrate an attempt to preserve his testimony or, indeed, to obtain it between the date of the indictment and the time of his death.

Thus, we are not convinced that the death of Thomas Clinton establishes the "substantial prejudice" which would warrant the dismissal of the indictment in this case.

Defendants next argue that the delay in indictment enabled the government to indict and try the defendants on the Washington, D. C., charges, thus tactically prejudicing them in the instant case because, *inter alia*, they could be impeached in these proceedings by use of the prior convictions, and also were irreparably prejudiced by the publicity surrounding the Washington, D. C. case which made a fair trial in this District impossible.[5] We cannot agree.

■ *First*, the law is clear that a defendant has no constitutional right to be arrested and charged with an offense.

---

5. We reiterate that there is no evidence that the government *intentionally* delayed the indictment in this case for tactical advantage or to prejudice the defendants.

* * * Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

*Hoffa v. United States*, 385 U.S. 293, 310, 87 S.Ct. 408, 417, 17 L.Ed.2d 374 (1966). See also *Hunt v. United States*, 456 F.2d 582, 583 (3d Cir. 1972). The authorities in this District and in the District of Columbia were free to pursue their respective investigations as they saw fit, in the absence of an intentional effort to gain a tactical advantage over the defendants by means of prejudicing their rights to a fair trial. Such a contention just cannot be sustained upon the record in this case.

■ *Second,* the offense in Washington, D. C., occurred in January of 1973, prior to the February 8, 1973 incident which was the basis for the instant prosecution. The indictment in the Washington, D. C., case was returned on August 15, 1973, before the August 24, 1973 indictment in this case. Thus, the government quite properly proceeded to trial in that case, in which the offense and the indictment were prior in time.

■ *Third,* the asserted prejudice from publicity and potential impeachment by reference to the Washington, D. C., convictions does not rise to the standard of substantiality under the criteria established by *Marion* and *Dukow,* to warrant dismissal of the indictment.

We took great pains, during the course of *nine days of jury selection,* to exclude potential jurors who had been exposed to the Washington, D. C., incident and the subsequent trial, even when they did not specifically connect these defendants with the episode; when such exclusion was requested by defendants, we granted it, even though we could justifiably have denied such requests, because of the prospective juror's lack of knowledge of the incident.

■ With respect to the impeachment question, the law is clear in this Circuit that while the government may seek to impeach a defendant by prior conviction of a felony, or of a misdemeanor amounting to *crimen falsi,* such evidence is not automatically admissible, but is subject to the discretion of the trial judge, who may exclude it if its probative value is outweighed by the prejudicial effect upon the defendant, *United States v. Greenberg,* 419 F.2d 808, 809 (3d Cir. 1969). In the instant case, we *expressly and absolutely* excluded from consideration by the jury any reference to the Washington convictions, a decision in which the government concurred. Moreover, the government agreed *not to cross-examine* the defendants with respect to the Washington convictions if they did decide to take the stand. (N.T. 36, November 12, 1974.) If the defendants did not wish to rely upon this representation by the government, they could have asked the Court for a ruling on the impeachment issue prior to giving testimony. This they did not do. Moreover, in the face of the clear representation of the Assistant United States Attorney in this regard, had he violated that agreement, a mistrial which could have been dispositive of the case, would have been ordered by us. Under the circumstances, therefore, we find any asserted injury from the threat of impeachment not only to be too speculative to establish the "substantial prejudice" which is required under *Marion* and *Dukow,*[6] but to be utterly without merit under the facts of this case.

6. We limit our discussion of impeachment to that which might have occurred *before the jury.* The government did bring the prior convictions to the Court's attention during the pretrial hearings, and we considered them on the issue of the defendants' credibility in their *pretrial* testimony. We were persuaded to rule as we did then, however, by the inherent implausibility of the defendants' testimony, and its obviously self-serving nature, and not by the impeachment value of prior felony convictions, none of which

For these reasons, we reaffirm our decision denying defendants' motion to dismiss this indictment based upon asserted pre-indictment delay.

b. *Post-indictment delay*

■ In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court established four guidelines which control the determination of speedy trial motions: (1) the length of the alleged period of delay, (2) the defendant's assertion of the right, (3) the reason for the delay, and (4) the prejudice to the defendant.

Each of these factors shall be considered separately.

(1) *Length of the delay.*

The total time from the indictment until October 21, 1974, was approximately fourteen months.

(2) *Defendants' assertion of the right.*

Clark first asserted the right to a speedy trial in a letter to the Court dated November 15, 1973. Christian and Griffin first asserted the right in a letter dated December 21, 1973.

(3) *The reasons for the delay.*

With respect to Clark, the delay from indictment until the original trial date of October 29, 1973, amounted to slightly more than two months, and was well within the normal period for trial preparation.

Christian and Griffin were fugitives until their arrest in Florida on October 2, 1973.

The delay from October 29, 1973, until February 11, 1974, occurred for the following reasons: (1) on October 3, 1973, Edward Weis, Esq., then counsel for Dabney, wrote to the Court requesting a continuance until after November 12, 1973, because of his impending marriage and wedding trip. (2) Counsel for Clark, when informed of the subsequent continuance by telephone, did not register any objection. (3) After the arrest

of Christian and Griffin in Florida, the government desired to try all of the four defendants at one trial. We made repeated efforts to secure court-appointed counsel for Christian and Griffin. After several withdrawals, the Court finally appointed James Binns, Esq., and Mark Dolin, Esq., experienced members of the trial bar. Christian and Griffin, however, refused to confer with them at their arraignment on December 5, 1973, nor would they do so, despite attempts by these lawyers to undertake the representation. Thus, the appointment of counsel had not been resolved by the end of January, 1974, the eve of the trial in Washington, D. C.

The delay from February 11, 1974, until May 17, 1974, was necessitated by the trial of these defendants on murder charges in Washington, D. C. The delay from May 17, 1974, until July 10, 1974, permitted completion of post-trial matters in Washington, D. C., and allowed defendants an opportunity to consult with their counsel in this District. We attempted to appoint counsel for Christian and Griffin during the Washington, D. C. trial, notwithstanding the refusal of these defendants to take any action, or to permit their Washington lawyers to take any action, in response to the Court's inquiries. On May 2, 1974, Harold Randolph, Esq., was appointed to represent Christian; on May 23, 1974, Harry Seay, Esq., was appointed to represent Griffin. A meeting of counsel was held in Chambers on June 6, 1974, at which time the trial was scheduled for July 12, 1974. Harry Seay first consulted with Griffin on June 13, 1974; Harold Randolph first saw Christian the following day.

The continuance from July 12, 1974 until October 7, 1974, was at the request of the government due to the health of prosecution witnesses.

The short continuance from October 8, 1974 until October 21, 1974 was granted to allow an investigation into alleged

---

involved *crimen falsi*. The testimony of each stood on its own bottom, and our con-

clusion was that none of them gave evidence which was believable.

threats to the family of Ernest Kelly, the chief prosecution witness, and to accommodate the trial schedule of Mr. Seay.

### (4) *Prejudice to the defendants.*

■ Among the factors to be considered in weighing possible prejudice to the defendants are (1) oppressive pretrial incarceration, (2) anxiety and concern, and (3) impairment of the defense, *Barker v. Wingo, supra,* 407 U.S. at 532–533, 92 S.Ct. 2182. None of these factors warrants dismissal of the indictment in the instant case, particularly when put in the proper perspective with respect to the length of delay and the reasons for that delay.

■ Oppressive pretrial incarceration is clearly not a significant factor in this case. *Clark was arrested on state charges on March 16, 1973, and began serving a fifteen year federal sentence four days later.* Christian and Griffin were incarcerated in connection with the offenses charged in the Washington, D. C., case from the date of their arrest in Florida on October 2, 1973, until the present time. Thus, each of these defendants would have been incarcerated during the entire period of these proceedings even if the instant indictment had never been returned.

Nor is anxiety a real factor in this case. Whatever emotional problems these defendants may have encountered, if any, certainly were more clearly attributable to the prior indictment in Washington, D. C., which charged them with multiple murders, offenses which are far more serious than the bank robbery which is the basis for the indictment in this case.

With respect to the impairment of their defense, the defendants present a myriad of claims, none of which is substantial or credible. We shall deal with all of these claims.

■ All defendants claim prejudice from the death of Lonny Anderson in the latter part of December, 1973. There is, however, not a shred of evidence, other than the palpably self-serving statements of these defendants, that Lonny Anderson knew anything at all about the events in question in this case; indeed, there is no independent evidence that Anderson was other than an individual known to the defendants who happened to have conveniently died during the pretrial period. There are no statements by Anderson in the possession of the defendants or their counsel, and no indication that any effort was made to procure such statements, notwithstanding the fact that he lived for several months after the state charges were lodged, as previously noted. Indeed, the government has no information about Lonny Anderson's connection with, or knowledge, of any of the matters in issue in this case. The testimony of the defendants is completely uncorroborated and inherently implausible. Defendants have every reason to fabricate such a story in an attempt to secure dismissal of the indictment in this case.

Similar reasoning applies in the case of Fred Davis, who died on November 10, 1973, and who Clark claims would have impeached the identification testimony of Ernest Kelly. Again, there is no independent evidence that Fred Davis was present at the meeting at which Kelly purportedly made statements that were inconsistent with his testimony at the trial, or that Clark was unable to locate any of the other persons who were also purportedly at the Mosque on that occasion.[7] See *United States v. Childs,* 415 F.2d 535, 539 (3d Cir. 1969).

Clark makes the same claim with respect to the death of Emily Jackson, apparently also known as Emily Burnett, on

---

7. Indeed, one of the purported witnesses, Barry Kelly, the son of Ernest Kelly, was apparently available to testify, and was not called by Clark; it is also significant that Clark stated that a number of people were present in the Muslim Mosque when this incident allegedly occurred, and who presumably would corroborate his story. Not one was called.

September 7, 1974, and James Kennedy, on October 1, 1974, and the purported deaths of Marvin Grier and Charles Robinson. He also claims that one Country Davis, an associate of Ernest Kelly, could have testified in his behalf, had he been located prior to trial. Again, there is not the slightest corroboration of these claims.

The only conclusion which we are able to reach from this tale of death and disappearance is that defendants' associates have a convenient and abnormally high mortality rate. We must agree with the Court in *United States v. Research Foundation*, 155 F.Supp. 650, 655 (S.D. N.Y.1957) when it rejected a similar contention:

> \* \* \* this move to dismiss the indictment may perhaps be regarded as a post mortem alibi. It is based on the alleged facts that all of the defense witnesses have died or are missing \* \* \*. There is some basis for believing that, by thus casting deceased persons in exculpatory roles, defendants hope to snatch a defense out of the jaws of death. The tactical theory behind this apparent maneuver is familiar: dead men tell no tales.

We must also conclude that Clark's claim of missing evidence is woven upon the same loom out of the same flimsy fabric. We took testimony from the Philadelphia Police and members of the staff of the United States Attorney in the District of Columbia, and we are satisfied as to the chain of custody of the evidence and the good faith of the government. Again, there is no showing of necessity to the defense, since at least one corroborative witness, one Geraldine Sistrone, was apparently available and was never called, and defendant himself testified that he had an independent recollection of the events in question, and, of course, he chose not to testify with respect to them.

In summary, we engaged in the "difficult and sensitive balancing process" mandated by the Court in *Barker v. Wingo, supra,* mindful of the fundamental rights of these defendants to a speedy trial. *Id.,* 407 U.S. at 533, 92 S. Ct. 2182. We conclude that none of these defendants was denied a speedy trial, nor, for the reasons previously discussed, were they denied due process or any rights under Rule 48(b). Accordingly, we reaffirm our prior rejection of the motions to dismiss the indictment.

2. *Severance*

Defendants claim that a new trial should be granted because the Court abused its discretion in refusing to sever the trial of Clark from that of Christian and Griffin. Clark argues that Christian and Griffin were arrested in the Kellys' home on February 8, 1973; that he was not arrested until some weeks later; and that the government's case therefore rested upon identification testimony by the Kellys. Hence, he states his trial should have been severed from that of the two co-defendants to avoid a "bandwagon effect". Christian and Griffin argue that since they were arrested in the Kellys' home, while Clark and Dabney accompanied Ernest Kelly to the bank, a severance should have been granted because of the jury's inevitable consideration of the evidence against Clark and Dabney in their deliberations with respect to Christian and Griffin. We find these arguments totally frivolous.

Initially, we note the general rule that persons jointly indicted should be tried together, except on a strong showing of prejudice. *United States v. Boyance*, 30 F.R.D. 146, 147 (E.D.Pa.1962). The burden falls upon the defendant to make such a showing. *United States v. Lipowitz*, 407 F.2d 597, 601 n. 15 (3d Cir. 1969), cert. den. 395 U.S. 946, 89 S.Ct. 2026, 23 L.Ed.2d 466. The fact that defendants might have had a better chance of acquittal if separately tried is, in and of itself, plainly insufficient to justify severance. *United States v. Cassino*, 467 F.2d 610, 622–623 (2d Cir. 1972), cert. den. 410 U.S. 913, 93 S.Ct. 957, 959, 35 L.Ed.2d 276, 410 U.S. 928, 93 S.Ct. 1363, 35 L.Ed.2d

590, 410 U.S. 942, 93 S.Ct. 1363, 35 L. Ed.2d 608. Particularly in conspiracy cases, in which a charge against the defendants may be proven for the most part, by the same evidence, a severance should not be granted, except when there are extenuating circumstances; *United States v. Boyance, supra,* 30 F.R.D. at 148. Conflict among defendants in conspiracy trials is common, and a severance should not be granted when this is the sole ground alleged, *United States v. Abrams,* 29 F.R.D. 178, 182 (S.D.N.Y. 1961).

Applying these general principles of law to the facts of the instant case, we find that Clark, Christian, and Griffin were all charged with the same offenses in the same counts of the indictment. Each of these defendants was charged with conspiracy in Count I, and each was charged with aiding and abetting the violation of the federal bank robbery statute by Dabney in Counts III, V, and IX. The fact that Christian and Griffin may have remained behind at the Kellys' home while Clark accompanied Ernest Kelly to the bank, or the fact that there was no identification of Clark by police officers, but by the Kellys alone, fall far short of the "strong showing of prejudice" required to grant a severance. Since the matter of a severance is committed to the discretion of the trial court, *United States v. Lipowitz, supra,* 407 F.2d at 599, and the defendants have failed to meet the burden imposed upon them by the law, we conclude that the denial of a severance was not an abuse of discretion, and we again reaffirm our prior denial of this motion.

3. *Change of venue*

Defendants next argue that we erred in refusing to grant a change of venue when the appropriate motions were made prior to trial, or when these motions were renewed during the process of jury selection. We do not agree.

With respect to the pretrial motions for change of venue, the law in this Circuit is well established that such motions are premature prior to voir dire of the prospective jurors. In *United States v. Addonizio,* 313 F.Supp. 486, 493 (D.N.J.1970), aff'd 451 F.2d 49 (3d Cir. 1972), cert. den. 405 U.S. 936, 92 Ct. 949, 30 L.Ed.2d 812, Judge Barlow outlined the correct procedure for the District Court when confronted with motions for change of venue based upon alleged adverse pretrial publicity; his analysis was subsequently adopted by the Court of Appeals for the Third Circuit, 451 F.2d at 61:

\* \* \* While the volume of such publicity resists precise definition, it was clearly both extensive and intensive. Even, however, accepting that characterization of the pre-trial publicity herein, this court is not persuaded that that fact alone necessarily precludes the possibility of selecting a fair and impartial jury for the trial of this indictment. Indeed, it has been recently held that publicity associating criminal defendants with "the Mafia' is not, per se, prejudicial. See *Patriarca v. United States,* 402 F.2d 314 (1st Cir., 1968), cert. denied, 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969); *United States v. Corallo,* 281 F.Supp. 24 (S.D.N.Y., 1968).

To presume, in advance of the voir dire examination of the prospective trial jurors, that the extent of the pre-trial publicity in this case negates the selection of a fair and impartial jury represents a premature and unwarranted supposition. This court is satisfied that a properly conducted voir dire will adequately protect the rights of these defendants to a fair trial. See *United States v. Wolfson,* 294 F.Supp. 267, 274 (D.Del.1968). If the voir dire disproves this assumption, the relief requested could then be reconsidered. \* \* \* *Id.,* 313 F. Supp. at 493–494.

Thus, we conclude that the motions for change of venue in advance of voir dire were properly denied.

Conceding that the pretrial motions for change of venue may have been premature, defendants nonetheless argue that the voir dire actually conducted in this case established the soundness of their original contentions, and that a new trial should be granted in another District. We reject those contentions.

The Court in *United States v. Farries*, 328 F.Supp. 1034, 1037 (M.D.Pa.1971), aff'd 459 F.2d 1057 (3d Cir. 1972), confronted a similar situation in prosecutions arising out of disturbances at Lewisburg Penitentiary in 1970. In concluding that defendants were tried by a fair and impartial jury, Judge Muir discussed several considerations which are equally applicable in the instant case:

Defendants are Black Muslims. They argued that their religious beliefs precluded their obtaining a fair trial in Lewisburg. Thus, it was argued that since there were no adherents of the Black Muslim faith in this area, the particular problems and views of this group could not be objectively evaluated. Additionally, it was argued that since the United States Penitentiary was a key economic factor in the area, an impartial jury could not be impanelled.

The ultimate question is whether it was possible in Lewisburg to select a fair and impartial jury. *Blumenfield v. United States*, 284 F.2d 46, 51 (8th Cir. 1960). The time for determination of this question is upon the *voir dire* examination. The record in this case will reflect that (1) an extensive and comprehensive examination was made of each individual member of the panel by the Court; (2) few of the prospective jurors had any prior knowledge of the case; (3) the Court allowed the defense great latitude

with respect to its challenges for cause when a prospective juror was in any way connected with the United States Penitentiary, and (4) the Court permitted the defense a number of peremptory challenges unparalleled in this district. While counsel at argument talked in terms of a "feeling of prejudice", the records clearly indicate that no actual prejudice existed.

In the instant case, we conducted an extensive, exhaustive and comprehensive voir dire examination of potential jurors which lasted nine days as reflected in the 1,449 pages of the record devoted to this aspect of the trial. We have carefully reviewed that transcript and again unequivocally conclude that a fair and impartial jury was in fact selected.

During the first days of jury selection, a large number of jurors were stricken for cause because of exposure to certain newspaper articles discussing the instant case and the prior Washington convictions. After this incident, however, the Court admonished members of the panel to avoid news media, and the problem was brought under control.

Great latitude was extended to defense counsel with respect to challenges for cause based upon knowledge of the instant case, exposure to the prior Washington convictions, prejudice against Black Muslims or black persons in general, and, indeed, whenever the slightest question arose as to the inability of a prospective juror to fairly and impartially serve in this case. Moreover, based upon our review of the record, we have found only *one* instance in nine days in which the Court denied a motion to strike a prospective juror for cause based upon exposure to pretrial publicity.[8]

---

8. Mrs. Mehas stated some familiarity with the circumstances surrounding the death of Major Coxson in Camden or Cherry Hill, New Jersey, which she associated with the Black Muslims. Upon questioning by defense counsel, however, she admitted that she might be confusing the so-called "Black Mafia" with the Black Muslims, and that she knew little or nothing about the Black Muslims. She had no knowledge of these defendants, nor of the Washington incident. Under the circumstances, the motion to

In *Farries,* each defendant was allowed four peremptory challenges. In the instant case, *each* defendant was allowed *six,* and the government *six.*[9]

▮ Under the circumstances, therefore, we are satisfied that the extensive voir dire and the liberal allowance of challenges for cause, which went far beyond the standards established by the decisions, enabled the defendants to choose from a jury panel that was not only free from bias and prejudice, but also from exposure to any pretrial publicity which could be considered even to be remotely prejudicial to defendants. Moreover, the *allowance of a total of eighteen peremptory challenges among the three defendants permitted them to exclude those potential jurors whom they thought may have harbored some hidden ill will or prejudice which did not appear on the record.* For these reasons, the motions for change of venue were properly denied. We are convinced that the exhaustive and painstaking procedure in jury panel selection gave all of the defendants every possible protection and benefit of any doubt.

II. *Jury selection*

Defendants next raise several challenges to the manner of jury selection.

▮ Two of these claims have been discussed at length in a prior portion of this Opinion: (1) the assertedly pervasive character of pretrial publicity concerning this case and the Washington convictions, and (2) the alleged failure of the Court to fully explore the prejudices of potential jurors against members of the Black Muslim faith. For the reasons previously discussed, we conclude that the extensive voir dire adequately neutralized the effects of pretrial publicity, and effectively excluded potential jurors who were prejudiced

against Black Muslims. It would be supererogation to repeat those reasons.

Defendants also claim that the use of voter registration lists from which potential jurors were selected for service excludes Black Muslims, who assertedly do not register to vote because of the tenets of that religion. We have previously considered and rejected such a claim, and we reaffirm our earlier action.

Initially, we note that there exists a procedural impediment to this challenge in the provisions of the Jury Selection and Service Act of 1968, Pub.L. 90–274, Mar. 27, 1968, 28 U.S.C. § 1861 *et seq.* Section 1867 provides as follows, in pertinent part:

> (a) In criminal cases, before the voir dire examination begins, or within seven days after the defendant discovered or could have discovered, by the exercise of diligence, the grounds therefor, whichever is earlier, the defendant may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of this title in selecting the grand or petit jury.

> \* \* \* \* \* \*

> (d) Upon motion filed under subsection (a) \* \* \* of this section, containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title, the moving party shall be entitled to present in support of such motion the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence. \* \* \* If the court deter-

---

strike for cause was denied by the Court. (N.T. 138–156, November 13, 1974). (She was, however, stricken peremptorily).

We note, however, that defense counsel, apparently for tactical reasons, did not move to strike for cause two potential jurors who admitted knowledge of the Washington inci-

dent (N.T. 60–66, 123–133, November 13, 1974).

9. The government ultimately waived two of its six peremptory challenges (N.T. 194, November 13, 1974).

mines that there has been a substantial failure to comply with the provisions of this title in selecting the petit jury, the court shall stay the proceedings pending the selection of a petit jury in conformity with this title.

(e) The procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal crime * * * may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title. * * *

These provisions of the statute have been strictly construed. In *United States v. Rickus*, 351 F.Supp. 1386 (E.D.Pa.1972), aff'd 480 F.2d 919, cert. den. 414 U.S. 1006, 94 S.Ct. 365, 38 L.Ed.2d 243 (1973), the Court was faced with a challenge to the jury panel based upon exclusion of persons within the ages of 18 and 25, and underrepresentation of blacks:

* * * The jury was selected on January 27, 1972 and defense counsel made his motion in writing during the afternoon of January 27, 1972 at the time of jury selection (Jan. 28, N.T. 2). On the morning of January 28, 1972 the Court heard oral argument on the motion and entered an Order denying the motion.

It is apparent from the statute, 28 U.S.C. § 1867(a), that the motion of defense counsel was too late. The motion was *after* the voir dire examination had begun. The defense contends that the motion was timely made because the defendants had a Motion to Suppress certain evidence which was denied on January 10, 1972, and since the time gap was only 17 days, from January 10 to 27, 1972, this did not allow defense counsel enough time to discover the alleged unconstitutionality of the selection of the jury (Jan. 28, N.T. 3).

The statute in question reads in the disjunctive, that is, ". . . before voir dire . . ., *or* within seven days . . ., whichever is earlier, . . ." [emphasis added]. The fact that defense counsel was engaged in other matters or did not have enough time to investigate his allegations is irrelevant. Defense counsel made his motion after the voir dire and there is no indication that defense counsel made his motion within the limits of the statute.

It is clear from reading the legislative history of the bill that Congress set up the time limitations to reduce the possibility of challenges to the jury for delaying purposes only. The legislative history as stated in 1968 U.S.Code Cong. and Adm.News, p. 1805, is as follows:

The new section 1867 establishes the procedure for challenging compliance with the act in the selection of both grand and petit juries. The Attorney General and the defendant in criminal cases, and both parties in civil cases, are allowed to challenge the selection procedures. But the provisions of the bill are designed to reduce the possibility that such challenges will be used for dilatory purposes.

First, the bill sets time limitations upon the availability of challenges. Subsections (a), (b), and (c) specify that challenges must be offered before the voir dire begins. And if the challenging party discovered, or in the exercise of diligence could have discovered, the grounds for the challenge earlier, the challenging motion must be made within 7 days of the earlier date.

In the instant case, defense counsel first raised this issue on the day when jury selection began, *before* the commencement of voir dire.[10] All counsel,

10. The challenge to the jury panel first appears on the record on November 13, 1974, when counsel made an oral motion immediately prior to the seating of the twelve jurors and two alternates (N.T. 203–204, November 13, 1974). On the face of the record, therefore, the motion was made *after* the voir dire. However, an oral motion was

however, had known of the Black Muslim affiliations of their clients for several months prior to November of 1974. It is likely, therefore, that counsel discovered, or in the exercise of diligence could have discovered, the grounds for the challenge prior to the date when the oral motion was in fact made. Under a strict reading of the statute, in light of the legislative history cited in *Rickus, supra,* it is probable that the oral motion was untimely and therefore barred. However, we shall assume, most favorably to the defendants, that the date when jury selection began, was the first point in time when their counsel discovered, or in the exercise of diligence could have discovered, that members of the Black Muslim faith did not choose to register to vote, and accordingly were not represented on the lists from which jury panels are called.

Even if we assume that the motions were timely when made,[11] defendants face yet another procedural obstacle in their challenge to the jury panel. As noted *supra,* § 1867 requires that a sworn statement of facts be filed with the motion challenging the jury panel. This requirement has also been strictly construed by the Courts. In United States v. Jones, 480 F.2d 1135, 1139 (2d Cir. 1973), the Court stated:

> Prior to the selection of the jury appellants moved to strike the jury panel "on the grounds that blacks and other minority members of the population were not adequately represented on the jury panels, and that * * *

the method of selection of jurors in this district is inadequate to accomplish the goals of the Federal Jury Service and Selection Act of 1968 * * *." They made an offer of proof and requested permission to subpoena witnesses, but did not file a motion "containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title", as required by 28 U.S.C. § 1867(d). Section 1867(e) provides that "The procedures prescribed by this section shall be the exclusive means by which a person accused of a Federal crime * * * may challenge any jury on the ground that such jury was not selected in conformity with the provisions of this title." Compliance with these express statutory requirements is necessary to question the validity of a plan adopted and approved pursuant to the Jury Selection and Service Act. (footnotes omitted)

See also *United States v. James,* 453 F. 2d 27, 29 (9th Cir. 1971).

In the instant case, no sworn statement in support of the motion was ever filed by counsel for any defendant. Under the cases cited *supra,* therefore, the challenge to the jury panel is barred.

Even if we assume, however, that literal compliance with the requirements of the statute should be excused under the facts of the case at bar,[12] an issue which we expressly decline to decide, the law in this Circuit is clear that defend-

---

made, off the record, on the first day of jury selection, *before* the voir dire. Counsel for the government conceded on the record *that the motion had been raised previously* (N.T. 204, November 13, 1974).

11. We stress that we *assume,* without deciding, that these motions were timely when made on the first day of jury selection, before voir dire.

12. At least two arguments could be advanced in support of the contention that the literal requirements of the statute should be inapplicable in the instant case. First, the *fac-*

*tual* basis of the motion; viz., that Black Muslims do not register to vote and accordingly do not appear on the jury selection lists, is essentially undisputed. The issue before the Court was thus one of law rather than fact. To require a defendant to submit a sworn statement in support of *undisputed* facts might be extreme casuistry. Second, the government did not raise this objection at trial, and permitted defendants to call the jury clerk to the stand. As stated, however, we expressly decline to decide this issue, since we are satisfied that defendants' challenge to the jury panel must fail on the merits.

ants must fail on the merits of their challenge to the jury panel.

In *United States v. Lewis,* 472 F.2d 252, 256 (3d Cir. 1973), the Court considered and rejected a challenge to the use of voter registration lists as the sole source of jurors, when that challenge was based upon the assertion that blacks in the divisions did not register to vote and the registration lists were accordingly unrepresentative of the community as a whole:

> In reviewing challenges to an approved plan (28 U.S.C. § 1863(a)), we "require that prospective jurors be selected 'without systematic and intentional exclusion' of any group." *United States v. Zirpolo,* 450 F.2d 424, 428 (3d Cir. 1971); *Dow v. Carnegie-Illinois Steel Corp.,* 224 F.2d 414, 423–24 (3d Cir. 1955), cert. denied, 350 U.S. 971, 76 S.Ct. 442, 100 L.Ed. 842 (1956). Similarly, the Fifth Circuit in *Camp v. United States,* 413 F.2d 419, 421 (5th Cir.), cert. denied, 396 U.S. 968, 90 S.Ct. 451, 24 L.Ed.2d 434 (1969) stated:
>
> > Use of [voter registration] lists as the sole source of names for jury duty is constitutionally permissible *unless this system results in the systematic exclusion of a "cognizable group or class of qualified citizens."* (emphasis added).

Therefore, the defendant must establish that blacks in the Pittsburgh Division choosing not to register to vote were a "cognizable group" which were "systematically excluded".

In *Camp* the Fifth Circuit further stated at 421:

> [The Fifth Circuit] and [other courts] have held that those who do not choose to register to vote cannot be considered a 'cognizable group.' [citations omitted]. The fact that some persons may from religious conscience or otherwise choose not to register to vote, does not, in our view, convert that subclass of nonvoters into a "cognizable group."

> We likewise hold that a group of persons who choose not to vote do not constitute a "cognizable group." Further, their non-registration is a result of their own inaction; not a result of affirmative conduct by others to bar their registration. Therefore, while a fair*er* cross section of the community may have been produced by the use of "other sources of names," the Plan's sole reliance on voter registration lists was constitutionally permissible. (footnotes omitted)

While the *Lewis* case did not deal with the question of nonrepresentation of those persons who for religious reasons choose not to register to vote, the quoted portion of the *Camp* opinion from the Fifth Circuit makes it clear that "[t]he fact that some persons may *from religious conscience* or otherwise choose not to register to vote does not * * * convert that subclass of nonvoters into a 'cognizable group' ".

■ The issue of the representativeness of jury panels is a difficult one, and the law may be in a state of flux. See generally Judge Gewin's very scholarly analysis of federal jury selection law, attached as an appendix to the Fifth Circuit's recent decision in *Foster v. Sparks,* 506 F.2d 805, 811–837 (5th Cir. 1975). At the present time, however, we are bound by the law as stated in *Lewis,* and we hold that the instant challenge, which is predicated upon the *voluntary election of Black Muslims to decline their right to register to vote because of their religious convictions that prompt them, of their own free choice, to refrain from registering, must fail on the merits.*

Defendants raise one further challenge to the manner of jury selection in this case. Because of the unfortunate exposure of a number of members of the original panel to newspaper articles concerning this case and the prior Washington convictions, it was necessary to summon additional jurors according to Section 10 of the Jury Selection Plan of the

United States District Court for the Eastern District of Pennsylvania, approved September 23, 1968, as amended, February 20, 1973. Section 10 provides as follows:

(a). Pursuant to 28 U.S.C., 1866(f), when there is an unanticipated shortage of available petit jurors for the trial of any case, the Court may order the Marshal to summon a sufficient number of petit jurors, selected at random from a prepared list, to fill the required emergency needs of the Court. Said list shall be prepared by the Clerk by selecting at random the names of jurors from the qualified jury wheel and then determining by written inquiry to the jurors so drawn whether or not said jurors would be available for service on short notice.

(b). The following random selection procedure will be used to select names from the qualified jury wheel for the short notice list:

(i). Total number of names in the qualified jury wheel
$$\div$$
Total number of names required to adequately supply short notice jurors = Stated Increment

(ii). The "starting number" will be drawn at random. The "stated increment" will determine the limit of the "starting number" range.

(c). The names, addresses and telephone numbers of those jurors who have indicated their availability on short notice shall be placed on the prepared list; the names of those jurors who have indicated their unavailability on short notice shall be replaced in the qualified jury wheel. This prepared list shall be remade every time the master wheel is emptied and the name of any juror on such list not used shall be replaced in the qualified jury wheel. This prepared list shall only be used when the Clerk has less than seven (7) calendar days notice of a shortage of jurors.

The Court extensively questioned the jury clerk in the instant case

with respect to his compliance with the procedures outlined in § 10. (N.T. 11–20, 102, November 13, 1974). We are satisfied that the requirements of § 10 and the statute upon which it is based, were fully complied with in this matter; counsel have failed, either during the jury selection process or thereafter, to demonstrate that the procedure was defective under the plan or the statute.

For these reasons, therefore, we dismiss the challenges to the manner of jury selection in the instant case, and accordingly deny any motions asserted for those reasons.

### III. *The trial*

Defendants raise a number of issues with respect to the conduct of the trial and certain rulings made during its course. We shall also discuss these contentions *seriatim*.

#### 1. *Disqualification of the trial judge*

Defendants presented oral motions during the course of the trial to disqualify the presiding Judge. These motions were denied by the Court. At this juncture, Christian and Griffin argue that a new trial is warranted before another Judge, on the ground that the Court erred in denying the motions for disqualification. Several arguments are offered in support of this contention: (1) the Court had previously tried a co-defendant, Richard Dabney; (2) the Court had personal knowledge of the kidnapping of a personal friend, an incident which was not even remotely related to the instant case, although it purportedly established in the minds of the defendants the Court's inability to objectively preside over the trial of these defendants; and (3) certain publicity with respect to the trial Judge which occurred during the course of the trial established grounds for disqualification.

Initially, we note that defendants failed to comply with the procedural requirements of 28 U.S.C. § 144, which provides as follows:

Whenever a party to any proceeding in a district court makes and files a

timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

 Defendants concede that no affidavit was filed according to the provisions of § 144; the record will also reflect that no certificate of good faith was filed by counsel for any defendant. These procedural defects in themselves would ordinarily be sufficient to defeat defendants' claims.

\* \* \* Although the statute is remedial, because of its nature and the possibilities of abuse, the orderly administration of justice requires that the affidavit and certificate be strictly construed and the terms of the statute strictly followed.

United States v. Gilboy, 162 F.Supp. 384, 388–389 (M.D.Pa.1958); see also Bumpus v. Uniroyal Tire Co. Division of Uniroyal, Inc., 385 F.Supp. 711, 713 (E. D.Pa.1974).

Even if we were to reach the merits of defendants' claims, however, we would find them devoid of substance.[13]

The claim that the Court should have disqualified itself because it presided over a jury trial which resulted in the conviction of Richard Dabney is patently frivolous. The law in this area was aptly summarized by Chief Judge Sirica in United States v. Mitchell, 377 F.Supp. 1312, 1316–1317 (D.D.C.1974):

In assessing sufficiency of the facts alleged by affidavit, decisions have emphasized that any bias must be personal, that is, have its origin "in sources beyond the four corners of the courtroom." In re Federal Facilities Realty Trust, 140 F.Supp. 522, 526 (N.D.Ill.1956). "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case." United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778 (1966).

\* \* \* \* \* \*

\* \* \* The Second Circuit has also ruled that it is not improper for the same judge to sit at the trials of co-conspirators tried separately. United States v. DiLorenzo, 429 F.2d 216, 220–221 (2d Cir. 1970), cert. denied 402 U.S. 950, 91 S.Ct. 1609, 29 L.Ed. 2d 120 (1971). See also, United States v. Beneke, 449 F.2d 1259 (8th Cir. 1971).

See also United States v. Gilboy, supra, 162 F.Supp. at 393–394.

13. Subsection (a) of the newly-amended § 455 of Title 28 provides for disqualification of a judge "in any proceeding in which his impartiality might reasonably be questioned." Pub.L. 93–512, § 1, 88 Stat. 1609, December 5, 1974. Presumably such disqualification could take place sua sponte, without the necessity for affidavits and certificates of good faith as required by § 144. Section 3 of Pub.L. 93–512 provided, however, that "[t]his Act shall not apply to the trial of any proceeding commenced prior to the date of this Act [December 5, 1974], nor to ap-pellate review of any proceeding which was fully submitted to the reviewing court prior to the date of this Act." In the instant case, we conclude that defendants' claims are barred by the procedural limitations of § 144. However, assuming arguendo that the amended § 455 is applicable to these proceedings, we are satisfied that there exist no grounds on which our "impartiality might reasonably be questioned." Thus we reject defendants' arguments whether grounded upon § 144 or upon amended § 455.

With respect to the claim in the case at bar, which is grounded upon the Court's familiarity with the government's evidence from the prior trial of Dabney, Chief Judge Sirica discussed the similar situation which existed in the so-called "Watergate" cases brought by the Special Prosecutor:

The Court's acquaintance with information perhaps pertinent to this case has in every instance flowed from court proceedings. There has not been, nor is there alleged to have been, any extrajudicial source. * * * Realizing that it probably has never seen or heard at least a large majority of the evidence that might be produced at trial, the Court has consciously avoided forming opinions based on the information that has come before it in various proceedings. The existence of such opinions, however, still would not constitute the personal bias or prejudice proscribed by § 144. Judges routinely pre-view evidence or information bearing on a case in other settings, with no thought of disqualification arising as a result. For example, in multi-defendant criminal cases, it is not unusual that one or more defendants enter guilty pleas just before trial and disclose to the trial judge the facts of their misconduct. Although other defendants are not heard at proceedings wherein voluntariness is assessed, and although the court may there become acquainted with evidence tending to incriminate remaining defendants, no one suggests that disqualification should follow.

*United States v. Mitchell, supra,* 377 F. Supp. at 1322 (footnote omitted).

Therefore, the fact that the trial Judge presided over a *jury trial* which resulted in a guilty verdict against a co-conspirator is not a sufficient ground for disqualification of the same Judge in a *subsequent jury trial* involving other co-conspirators.[14]

The other asserted grounds for disqualification are equally frivolous. We need not extensively discuss the patently absurd claim that the fact that a personal friend of the Court had been kidnapped in and of itself should disqualify us from participation in a case which involves an offense under 18 U.S. C. § 2113(e); viz., taking a hostage in the course of a bank robbery. Likewise, there is no tenable claim with respect to prejudice to the defendants arising out of any media publicity concerning the trial Judge which occurred during the trial. We questioned the potential jurors about their exposure to such publicity, and received uniformly negative responses. Any claim that such publicity would affect our ability to objectively preside over the instant case is utterly without foundation.[15]

Accordingly, the motions to disqualify the trial Judge were properly denied during the course of these proceedings, and we reaffirm that denial.

### 2. *Photographic evidence*

Defendants assert that the Court erred in admitting post-arrest photographs of Christian and Griffin, and in permitting testimony concerning the existence of a pre-arrest photograph of Clark. We cannot agree.

We deal first with the claim of Clark, which is based upon the fact that testimony was admitted during the trial with

14. We note that the instant case is *not* analogous to the situation in which a Judge has seen the presentence report prepared on a *specific* defendant and thereafter presides over a jury trial or re-trial of that defendant. See e. g., *Gregg v. United States,* 394 U.S. 489, 492, 89 S.Ct. 1134, 22 L.Ed.2d 442 (1969), *United States v. Small,* 472 F.2d 818, 821 (3d Cir. 1972). There is no contention that this Court has considered presentence reports concerning Clark, Christian, or Griffin; in fact, we have not seen such reports.

15. See N.T. 2–10, November 13, 1974, in connection with the procedure followed in deciding this motion.

respect to the identification by the Kellys of a photograph of Clark in the possession of the Philadelphia Police Department.

The law in this area was delineated by Judge Biggs in *United States v. Hines*, 470 F.2d 225, 227–229 (3d Cir. 1972), cert. den. 410 U.S. 968, 93 S.Ct. 1452, 35 L.Ed.2d 703 (1973):

> * * * In [*Commonwealth v. Allen*, 448 Pa. 177, 292 A.2d 373 (1972)], the [Supreme Court of Pennsylvania] held under circumstances substantially the same as those here that as a principle of Pennsylvania's law of evidence, a reference to a defendant's photograph in police possession constitutes reversible error where "a juror could reasonably infer from the facts presented that the accused had engaged in prior criminal activity." Since "the constant mention of photographs during direct examination permitted the jury to infer that the appellant had a prior criminal record," the "prejudice thus created" required reversal. *Allen* at 181–183, 292 A.2d at 375–376.

It cannot be denied that in the case at bar the jury may conceivably have inferred the existence of Hines' criminal record from the numerous references to his photograph. Indeed we concede the possibility of some prejudice. But even so, we cannot accept this *Allen* doctrine, for contrary to the principles enunciated in the cited case, admissibility of evidence does not turn on prejudice alone. * * * *Evidence of other offenses may be received if relevant for any purpose other than to show a mere propensity or disposition on the part of the defendant to commit the crime.*

> * * * * * *

Thus, as we have said, in deciding the admissibility of evidence indicating Hines' criminal record, the potential for prejudice to him is not the sole factor to be considered. Taking into account all the attendant circumstances, we must balance the degree of prejudice with the probative value of the evidence. * * *

Turning to the case at bar, we hold that no error has been committed, much less one of constitutional dimensions. References to the pretrial photographic identifications were made to buttress the in-court identifications. "This has been a proper and strategically sound tactic for years." [citations omitted] * * * Evidence of pre-trial identifications is even more important where, as here, the trial takes place seventeen months after the crime was committed, since such a time lapse would invariably strengthen the possibility of a mistaken identification in the minds of the jurors. * * *

We are not faced with a situation in which a "mugshot" itself was introduced into evidence * * *, nor one in which the word "mug-shot" was even mentioned * * *. The inference of Hines' criminal record, the tendency of the identification evidence to prejudice, is much weaker here, and it is at most speculative that such an inference could have had any appreciable effect on the verdict of the jury. * * *

■ In applying the teaching of *Hines* to the facts of the case at bar, we note the following considerations: (1) The photograph itself was not offered or admitted into evidence at trial. (2) The testimony was presented by the government to corroborate the in-Court identification of Clark. (3) The word "mugshot" or words of similar connotation were not mentioned in front of the jury. (4) The Court cautioned the jury at the time of the testimony in question, and again in the charge, concerning the effect of the testimony with respect to the photograph of Clark:

> Also, as I instructed you during the trial, the fact that the police allegedly had access to a photograph supposedly of John Clark gives rise to no inference that John Clark had ever in the past been charged with, connected

with or suspected of criminal conduct. The police may have access to many photographs from many sources, many of which may have been obtained from official records which have nothing to do with law enforcement. For this reason, I instruct you that you are to draw no inference from the testimony with respect to alleged photographs of John Clark, that John Clark had ever in the past been charged with, connected with or suspected of criminal conduct of any sort. Such an inference is not permissible.

(N.T. 68–69, November 21, 1974; Charge of the Court).

Accordingly, under the standard of *Hines*, we conclude that testimony with respect to the existence of a photograph purportedly of Clark in the possession of the Philadelphia Police Department was properly admitted at the trial, and a new trial on this ground is completely unwarranted.

▆▆▆ The claim with respect to the admission of the *post-arrest* photographs of Christian and Griffin is clearly frivolous. These photographs were cropped to remove prejudicial markings, and a cautionary instruction was given by the Court:

The fact that post-arrest photographs may exist allegedly of defendants Christian and Griffin have been introduced by the Government merely to corroborates [sic] its contention that these defendants were inside the Kelly residence on February 8th of 1973. You may give this evidence such weight or no weight and assign it such relevance or no relevance as in your judgment or discretion think proper but I do instruct you the fact that Christian and Griffin were arrested is in intself no evidence of guilt any more than the fact that they were indicted and brought to trial.

(N.T. 68, November 21, 1974; Charge of the Court).

For these reasons, the motions based upon the allegedly *improper use of* photographs at trial are denied.

### 3. *Testimony of Ernest Kelly*

Defendants contend that the testimony of Ernest Kelly was improper and prejudicial for two reasons: (1) the government should not have been permitted to call Kelly as a witness, knowing that he would claim the protection of the Fifth Amendment with respect to certain matters which would be raised by defendants on cross-examination, and (2) the Court failed to adequately control Kelly during his appearance on the stand. Both contentions utterly lack merit.

### a. *The Fifth Amendment*

The government asked Kelly on direct examination if he had been involved in illegal numbers writing, and he answered in the affirmative. On cross-examination by counsel for Griffin, Kelly stated that he had been advised by his attorney to refuse to answer such questions. At that point, we cautioned the jury as follows:

THE COURT: Let me say this, members of the jury. At my instruction when we recessed last night, and this was out of your hearing and now it will be in your hearing, I did say that in response to Mr. Miller's question with respect to any activities of Mr. Kelly that may be illicit activities that he should have the advice of his own counsel because obviously Mr. Miller is the United States Attorney and is not his private attorney but is representing the Government with respect to whether he should answer any of these questions.

\* \* \* \* \* \*

(N.T. 64, November 16, 1974).

THE COURT: Now, let me say this to you, members of the jury. It's quite clear that since Mr. Kelly is here as a witness—he is not a party to this suit in the sense that he is not here as if this, for example, were a

civil suit that he is a plaintiff or a defendant who is either suing or being sued. He is here as a witness for the Government. He has a perfect right to do so, namely, that he has a right to refrain from answering any questions that may tend to incriminate him.

\* \* \* \* \* \*

Now, obviously, in evaluating the testimony of witnesses you have the right to evaluate the fact that Mr. Kelly may be engaged in certain other activities that he is not going to testify about as weighing upon the credibility of his testimony and, again, this would be a matter that there would be argument by counsel for you but certainly coming here, as he has, as a witness for the Government, he is not a party to the suit but he is a witness for the Government and he has the right to claim this right not to testify just as, as I have told you, the defendants themselves in this very case have the right not to testify about any matter that should not be held against them and so the fact that he may claim the fifth amendment with respect to this matter should not be held against Mr. Kelly in any way except, as I say, that you can evaluate this in terms of judging his entire testimony, judging all of the factors that I will instruct you about later in detail with respect to weighing the testimony of a witness and evaluating that.

(N.T. 66–67, November 16, 1974).

After a colloquy, we permitted Kelly to be excused, and ordered him to return with his counsel at a subsequent session. The jury was instructed that Kelly had been temporarily excused and would return with his lawyer (N.T 82, November 16, 1974).

When Kelly took the stand again, accompanied this time by his counsel, he once more admitted on cross examination that he had been involved in illegal lotteries or numbers writing "[a]t one time", (N.T. 5, November 18, 1974), but refused to answer questions pertaining to income tax matters (N.T. 5, Novem-

ber 18, 1974), or the use of funds from numbers in illegal sales of narcotics (N. T. 6, November 18, 1974). He denied participation in organized crime or sale and receipt of stolen goods (N.T. 7–8, November 18, 1974). Further questions pertaining to the operation of an illegal lottery also caused Kelly to invoke the Fifth Amendment protection (N.T. 8, November 18, 1974). Finally, when counsel returned to the question of numbers writing, Kelly testified as follows:

Q. What time does the numbers business usually start to come through the bar?

A. I couldn't tell you. What bar?

Q. Either of your bars that you are involved in, Ernie's Gay Paree and the other bar.

A. There's no number activity in either one of the bars.

Q. Do you conduct that outside of the bar?

A. I don't conduct the number game, period.

Q. You conduct numbers activity at your home?

A. Definitely not. Why don't you join the police force?

(N.T. 15, November 18, 1974).

In summary, therefore, Kelly admitted to past participation in numbers writing, denied "conducting" the numbers game at present, denied participation in organized crime and sale and receipt of stolen goods, and refused to answer questions pertaining to the operation of the numbers game, income tax matters, and the use of proceeds from numbers in illegal narcotics transactions.

 Initially, we are satisfied that Kelly properly invoked the Fifth Amendment at the trial, and that his responses to certain questions did not amount to a waiver of his privilege against self-incrimination with respect to other questions. In essence, Kelly merely admitted to *past* participation in numbers writing, an admission which was not necessarily incriminating, since this activity

could have occurred so long ago that a present prosecution would be barred by the applicable statute of limitations; indeed, Kelly might have already suffered prosecution for these offenses by the appropriate authorities, thus barring further prosecution under the Double Jeopardy clause. As the Supreme Court long ago stated in the leading case of *McCarthy v. Arndstein*, 262 U.S. 355, 359, 43 S.Ct. 562, 67 L.Ed. 1023 (1923), aff'd on reh., 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158:

> * * * where the previous disclosure by an ordinary witness is not an actual admission of guilt or incriminating facts, he is not deprived of the privilege of stopping short in his testimony whenever it may fairly tend to incriminate him.

Thus Kelly properly asserted, and the Court properly sustained, his Fifth Amendment privilege against self-incrimination during the trial.[16]

Defendants now claim that they were prejudiced as a result of the invocation of the Fifth Amendment by Kelly when he was questioned about his activity in illegal lotteries and numbers. In assessing the force of this contention, we turn for guidance to the Supreme Court decision in *Namet v. United States*, 373 U.S. 179, 186–187, 83 S.Ct. 1151, 1154, 10 L. Ed.2d 278 (1963) (footnote omitted):

> None of the several decisions dealing with this question suggests that reversible error is invariably committed whenever a witness claims his privilege not to answer. Rather, the lower courts have looked to the surrounding circumstances in each case, focusing primarily on two factors, each of which suggests a distinct ground of error. First, some courts have indicated that error may be based upon a concept of prosecutorial

misconduct, when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege. This seems to have been one of the principal reasons underlying the finding of reversible error in *United States v. Maloney*, [262 F.2d 535 (2d Cir. 1958)]. In that case, the prosecution admitted knowing that two of its key witnesses could validly invoke the privilege against self-incrimination and intended to do so. The prosecutor nevertheless called and questioned them. The court also found that the Government's closing argument attempted to make use of the adverse inferences from their refusals to testify. See also *United States v. Tucker* [C.A. 3 Pa.], 267 F.2d 212. A second theory seems to rest upon the conclusion that, in the circumstances of a given case, inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant. This theory seems also to have been present to some extent in the Maloney decision, where the court noted that the challenged inferences were the only corroboration for dubious and interested testimony by the Government's chief witness. 262 F.2d, at 536–537. On the other hand, courts have failed to find reversible error when such episodes were "no more than minor lapses through a long trial." *United States v. Hiss*, 185 F.2d 822, 832 (C. A.2d Cir.). See also *United States v. Amadio*, 215 F.2d 605, 614 (C.A. 7th Cir.). And even when the objectionable inferences might have been found prejudicial, it has been held that instructions to the jury to disregard them sufficiently cured the error.

---

16. The instant case is thus clearly distinguishable from *Rogers v. United States*, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344 (1951), cited by counsel at trial. In *Rogers*, the witness freely answered certain *incriminating* questions, and was thereafter required to make full disclosure, on the ground that response to the specific question put to her would not *further* incriminate her. *Id*. at 372–373, 71 S.Ct. 438.

In applying the teaching of *Namet* to the facts of the instant case, we note the following: (1) The government has represented that it had no advance knowledge that Kelly would invoke the Fifth Amendment when questioned on cross-examination. We are satisfied with the good faith of the government's representation in this matter. The record clearly indicates that it was the Court which suggested to Kelly that he consult with counsel with respect to his testimony concerning certain matters, and that Kelly's decisions to invoke the Fifth Amendment privilege occurred only after such consultation with his attorney. Thus there is no aspect of "prosecutorial misconduct" in the government's decision to call Kelly as a prosecution witness. (2) There is no contention in this case that the government made "a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege". *Id.* at 186, 83 S.Ct. at 1154. Indeed, the inferences which might arise from Kelly's invocation of the Fifth Amendment—viz., that he was in fact involved in illegal lotteries or numbers, income tax evasion, or use of funds derived from numbers to finance illegal sales of narcotics—were clearly *unfavorable to him as a key government witness* and, therefore, to the government itself, *and would tend to harm rather than assist the government's case*. Thus Kelly's invocation of the privilege could not possibly have "added critical weight to the prosecution's case in a form not subject to cross-examination". *Id.*, at 187, 83 S.Ct. at 1155. Indeed, he invoked the privilege only when cross-examined by defense counsel and not in his direct testimony. (3) The crucial element in *Namet*, and in *Frazier v. Cupp*, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969), upon which defendants place principal reliance, just does not exist under the facts of this case. In *Namet* and *Frazier,* and in lower court decisions which have considered the issue, the prejudice to the defendant is said to arise from the witness' invocation of the Fifth Amendment privilege with respect to questioning concerning the witness' criminal activity *with the defendant.* As the petitioner argued in *Namet, id.* at 185–186, 83 S.Ct. at 1154, "when a witness is asked whether he participated in criminal activity *with the defendant,* a refusal to answer based on the privilege against self-incrimination tends to imply to the jury that a truthful answer would be in the affirmative." (emphasis added). In the instant case, there is no claim that Kelly's refusal to testify with respect to certain matters even remotely implied that he had been involved in criminal activity with any of the defendants, or that such activity on the part of Kelly was in any way related to the offenses charged in the instant indictment. Accordingly, the reasoning of *Namet* and *Frazier* is inapplicable under the facts presented in this case. (4) Finally, the Court delivered cautionary instructions to the jury at the time Kelly testified, and again in its instructions said:

\* \* \* You have heard Mr. Kelly's testimony. There has been a great deal of discussion about his plea of the fifth amendment to lottery and, as I recall it, to narcotics as well, although your memory controls. It's also my recollection that he denied participation in other illegal acts that were raised by counsel for defendants, although, again, your memory controls.

As I instruct you, a witness has the right to take the fifth amendment. You should understand this amendment permits someone not to answer if an answer may tend to incriminate him. It does not mean a person is guilty of a crime. It may mean that he is not certain whether the answer might establish criminal conduct on his part and, therefore, our constitution gives every citizen the right to invoke this privilege.

However, in this connection you may consider whether he has testified

as he has for the Government because of any concern he may have about being prosecuted if he does not so testify for the Government. Similarly, you may conclude that given the totality of the evidence, the totality of his testimony and weighing his testimony in light of all the factors I have given you that he is to be believed with respect to the incidents which he has related which are the basis of the charges against these defendants, even though you may find him to be a person about whom you have a low opinion, for any number of reasons. If in considering his testimony and in applying the factors I have given you you do not find him to be credible then his testimony may be rejected. In evaluating his testimony and his credibility you may take into consideration what effect, if any, his hostility toward these defendants and their counsel may have on his credibility.

(N.T. 76–77, November 21, 1974; Charge of the Court).

Accordingly, we reject the contention of the defendants that they were unfairly prejudiced by Kelly's invocation of the Fifth Amendment privilege against self-incrimination. Indeed, pursuance of this matter by defense counsel was for the purpose of discrediting Kelly, and although properly pursued for that purpose, constituted the event which triggered the invocation of the privilege. That the Jury, notwithstanding its impression of Kelly on this score, nevertheless found the defendants guilty, tends to demonstrate that the evidence was such as to persuade the Jurors of defendants' guilt, even though they were aware of Kelly's questionable practices.

b. *The demeanor of Kelly as a witness*

Defendants also contend that the Court failed to exert sufficient control over the demeanor of Kelly while he was on the stand, thus permitting him to avoid responsive answers to questions posed by defense counsel, and to exhibit a generally hostile and disrespectful attitude to defendants and their lawyers.

We have carefully examined those portions of the record which included Kelly's testimony. While there was certainly friction between Kelly and his cross-examiners, this quite naturally arose from the circumstances of the offense of which Kelly was a victim. Moreover, the persistent efforts of counsel to connect him with narcotics, prostitution, organized crime and receipt of stolen goods, while entirely proper areas of cross-examination, predictably would draw a hostile response from the average layman. Finally, we cautioned the jury in the following manner:

\* \* \* In evaluating [Ernest Kelly's] testimony and his credibility you may take into consideration what effect, if any, his hostility toward these defendants and their counsel may have on his credibility.

(N.T. 77, November 21, 1974; (Instructions of the Court)).

Upon a review of the entire record, we are satisfied that we adequately controlled the courtroom demeanor of Kelly, and that defendants were not prejudiced by any hostility which Kelly may have exhibited toward defense counsel.[17]

---

17. We likewise reject a novel contention raised by counsel for Clark. It is argued that the Court erred in complimenting counsel for the defense, since the "[effect] of the compliments was to establish for the jury an atmosphere in which the Government was depicted as being set upon by three experts and detracted from the reality of the Government being represented by extremely competent counsel with the backing of the FBI, Philadelphia Police Department, a staff of lawyers, a computerized research system and unlimited funds for prosecution". Brief in Support of Motion for New Trial, Motion in Arrest of Judgment and Motion for Judgment of Acquittal, at pp. 7–8. While the "David and Goliath" theory finds some support in *United States v. Guglielmini*, 384 F.2d 602, 605 (2d Cir. 1967), but see Judge Moore's dissent, 384 F.2d at 607–609, it is clearly unsupported by the facts of the instant case.

IV. *Instructions to the Jury*

Defendants raise at this juncture a number of objections to the instructions to the Jury by the Court. None of these objections, in our view, has merit.

1. *Burden of proof*

Defendants argue that the Court in its instructions to the jury suggested that if the testimony of the Government witnesses and the inferences the Government desired to have the jury draw from that testimony were accepted by the jury, then the evidence would be sufficient for the jury to find the defendants guilty beyond a reasonable doubt. Such an instruction, it is said, would impermissibly shift the burden of proof to the defendants, and require them to come forward to rebut the government's prima facie case. In support of this proposition, defendants cite *United States v. Lowry*, 456 F.2d 341 (5th Cir. 1972).

While defendants have not deigned to cite the specific portion of the charge, which is fifty-seven pages in length, we assume that the portion of the instructions to which they take exception is the following:

> * * * You are to consider only the evidence in the case which I have said is the testimony which you heard from the lips of the witnesses who testified, that is, all of the testimony plus the exhibits themselves, but in this consideration you are not limited to what I call the bald statements of the witnesses. In other words, you are not limited solely to what you see and hear as the witness testified. You are permitted to draw from facts which you find have been proved such reasonable inferences as you feel are justified in the light of your own experience.
>
> Inferences, I think as we know from our own every day life, are deductions or conclusions which our own reason and common sense leads us to draw as individuals and lead you to draw as jurors from the facts which have been

established by the evidence in the case.

> * * * It is only that, as I said, which you get from the witnesses in both the direct testimony, the circumstantial evidence and the inferences or conclusions that you are able to draw from what you hear are the evidence which you may consider.

(N.T. 70–71, November 21, 1974).

In *United States v. Lowry, supra*, 456 F.2d at 346, the disapproved instruction was as follows:

> If you accept the testimony of the witnesses of the Government and the inferences the Government would have you draw therefrom, then the evidence is sufficient for you to find these defendants and each of them guilty beyond a reasonable doubt.

The Court in *Lowry* concluded that this instruction "told the jury essentially that there was sufficient evidence to convict unless it believed the Government witnesses were lying or that the inferences the Government urged were improbable", thus "impermissibly shift [ing] the burden of proof to the accused, requiring them to come forward to rebut the Government's prima facie case that the [trial] court announced had been made". *Id.*, 456 F.2d at 347 (footnote omitted).

 The distinction between the instruction condemned in *Lowry* and that delivered in the instant case is clear. Our instruction neither stated to the jury that the government had established a prima facie case, nor did it tell them that there was sufficient evidence to convict the defendants, unless, and only unless the jury believed that the government witnesses were lying, or that the inferences that the government urged were improbable. *On the contrary*, we specifically instructed the jury that:

> [s]ince the burden is upon the Government to prove the defendants guilty beyond a reasonable doubt of every essential element of the crime

charged, the defendant has a right to rely upon the failure of the prosecution or the Government to establish such proof.

(N.T. 67, November 21, 1974). Further, we instructed the jury repeatedly with respect to each count, and with respect to each essential element that the burden is *never upon a defendant in a criminal case to produce any evidence or to testify in his defense, and that no adverse inference may be drawn from a failure to produce evidence or to take the stand.* Similarly, we repeated in the instruction as to each count precisely what burden the government had to meet. (N.T. 61 to 118, November 21, 1974).

Accordingly, we conclude that *United States v. Lowry* has no application to our instructions to the jury in this case.

2. *Care, custody, control, management, or possession of a bank*

Defendants argue that the Court erred in its instructions to the jury with respect to the federal character of the offense; viz., the care, custody, control, management, or possession of a bank.

We quote the portion of the instructions as it pertains to that matter:

> The government is not required to prove that the contents of the safe deposit box were Federally insured on that date. Rather, the Government must prove beyond a reasonable doubt that the deposits of the bank were so insured.

> \* \* \* \* \* \*

> Now, then, the question of possession by a bank. The law recognizes two kinds of possession, what we call actual possession and what we call constructive possession.

> The person who knowingly has direct physical control over a thing at a given time is in what we call actual possession of it.

> A person who, although not in actual possession, knowingly has both the power and the intention at the given time to exercise dominion or control over a thing either directly or through another person or persons is then what we call in constructive possession of it.

> The law recognizes also that possession may be sole or joint. If one person alone has actual or constructive possession of a thing, possession is sole. If two or more persons share actual or constructive possession of a thing, possession is joint.

> If you should find beyond a reasonable doubt from the evidence in the case that at the time and place of the alleged offense, February 8, 1973, the Continental Bank either alone or jointly with others had actual or constructive possession of the property or money or other thing of value described in the indictment then you may find that such property or money or other thing of value was in the possession of the Continental Bank within the meaning of the word "possession" in these instructions.

> The statute not only covers property, money or other things of value in the possession of a Federally insured bank. The statute also covers property, money, or other things of value in the care, custody, control or management of a Federally insured bank.

> Thus, the Government must prove beyond a reasonable doubt as an essential element of the crime charged that Richard Dabney did knowingly and unlawfully by force and violence or by intimidation attempt to take from the person or presence of another property or money or other things of value in the care, custody, control, management or possession of a Federally insured bank.

(N.T. 97–99, November 21, 1974).

We are satisfied that these instructions correctly stated the law to the jury.

██ *First*; it is clear that the statute does not require that the contents of a safety deposit box be insured by the Federal Deposit Insurance Corporation (F.D.I.C.). On the contrary, subsection

(f) of § 2113, Title 18, United States Code, specifically refers to "any bank *the deposits of which* are insured by the Federal Deposit Insurance Corporation", (emphasis added).

■ *Second*; the contents of a safety deposit box are within the "care, custody, control, management, or possession" of a bank, as those terms are used in the bank robbery statute.

This question was considered a number of years ago by the Court of Appeals for the Tenth Circuit in *Alford v. United States*, 113 F.2d 885, 887–888 (10th Cir. 1940) (footnotes omitted):

> Counsel for Alford further contends that the evidence was insufficient to support a verdict of guilty on the second count. We think the evidence fully warranted the finding that Alford entered the bank and obtained access to the safety deposit box of Cargill with intent to steal the contents of the box. * * *
>
> * * * We think it clear, therefore, that the contents of Cargill's box was in the care of the bank.

More recently, the Court of Appeals for the Ninth Circuit decided another safety deposit box case, *United States v. Dix*, 491 F.2d 225 (9th Cir. 1974), and concluded that a federal crime was committed by an employee who accompanied her employer to the bank and stole negotiable securities while helping him clip coupons in the bank's conference room. The Court stated:

> The language of the statute is broad. It covers thefts not only of property within the possession of the bank but also of property within the care, custody, control or management of the bank. We hold that when Malouf [the employer] took his safe deposit boxes into the bank's conference room to examine or otherwise deal with the contents of the boxes, those contents were within the care of the bank, and the theft of some of those items was a crime within the contemplation of § 2113(b).

In *Chapman v. United States*, 346 F.2d 383 (9th Cir.), cert. den. 382 U. S. 909, 86 S.Ct. 249, 15 L.Ed.2d 161 (1965), a former bank employee used a key to the front door of the bank, which she had either kept or copied, to enter the bank after regular hours. She then stole books and papers from the desk of her successor. Some of the stolen items were property of the bank, and some were the property of Mrs. Chapman's successor. In response to a claim very similar to that made in the present case, we said,

> This property, including Miss Hall's personal documents, were, while owned by her and used by her in the performance of her duties at the bank and left there when she left for the day (and even while she was there for the day), "within the care, custody or control of the bank," and thus within the statute here involved. 346 F.2d at 387.

The Chapman opinion does not make altogether clear the basis for finding the property within the statute. However, reference to the law of negligence illuminates the meaning of the word "care." The bank owes a duty of care to its customers, just as any business owes to its business invitees, to maintain its premises in a condition reasonably fit for the carrying on of the banking business. The duty extends to protection from unreasonable risk of harm by robbers or other potential assailants or thieves. See e. g., *Sinn v. Farmer's Deposit Savings Bank*, 300 Pa. 85, 150 A. 163 (1930); *Murray v. Modoc State Bank*, 181 Kan. 642, 313 P.2d 304 (1957); *Boyd v. Racine Currency Exchange, Inc.*, 8 Ill.App.3d 140, 289 N.W.2d 218 (1972).

In addition, there is a duty to exercise reasonable care for the protection of property which the customer properly brings into the premises. *Fuller v. I. Magnin & Co.*, 104 Cal.App.2d 517, 232 P.2d 36 (1st Dist., 1951).

We conclude, based on Chapman, supra, and on the duty of care which the bank owes to its customers, that the bonds stolen here were in the "care" of the bank, even though this duty did not extend to requiring or permitting the bank to follow Malouf into the conference room where the coupon clipping chore was performed.

In other words, the duties of care owed to Malouf and his property provide us with sufficient nexus to say the bonds at the time they were filched in the bank were in the bank's care and Malouf's care.

*Id.*, 491 F.2d at 226–227 (footnote omitted).

Accordingly, we are satisfied that our instructions to the jury correctly stated the law of *Alford*, *Dix*, and *Chapman*, and defendants' motions based upon asserted error on this score will be denied.

V. *The sufficiency of the evidence to support a conviction for aiding and abetting*

Finally, Christian and Griffin challenge the sufficiency of the evidence to support their conviction on aiding and abetting the commission of the federal bank robbery offenses by Dabney.

We need not discuss this contention in detail. We merely note that the appropriate legal standard was presented to the jury in connection with our instructions relative to the aiding and abetting counts of the indictment:

\* \* \* As I have stated, the law of the United States provides that whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal. That is, punishable as though he himself had committed the offense against the United States.

However, mere presence at the scene of a crime or knowledge that a crime is being committed are not sufficient to establish that the defendant is guilty under the appropriate section of the law unless you find beyond a reasonable doubt that a defendant was a participant and not merely a knowing spectator.

To be a participant within the means of the law means that a defendant must be proven beyond a reasonable doubt to have willfully associated himself in some way with a criminal venture and willfully participated in it as something he wished to bring about; that is to say, that he willfully sought by some act or omission of his to make the criminal venture succeed.

An act or omission is willfully done if done voluntarily and intentionally and with the specific intent to make the criminal venture succeed and not by accident, mistake or for any other innocent reason.

Again, as I have said, mere presence at discussions of plans for robbery, knowledge of purpose, and passive assent without more are insufficient. Some positive act of association with the requisite specific intent is required. The act or omission must at least have encouraged the criminal venture.

Again, I remind you that you may not find any of the defendants guilty of the offense charged in count three unless you first determine beyond a reasonable doubt that Richard Dabney committed the offense charged in count two of the indictment. However, the Government need not actually produce Richard Dabney at trial or prosecute in the same proceeding as other defendants. Rather, it must prove beyond a reasonable doubt that Richard Dabney committed the offense charged in count two of the indictment and beyond a reasonable doubt that John Clark, John Griffin and William Christian aided, abetted, counseled, commanded, induced or procured its commission with the meaning of the law which I have explained to you.

Again, as I have told you, the Government must prove beyond a reasonable doubt that defendants had the

specific intent by their actions to aid and abet the commission by Richard Dabney of the felony affecting the Continental Bank.[18]

(N.T. 100–102, November 21, 1974).

This instruction is a correct statement of the law, see e. g. *United States v. Hopkins*, 354 F.Supp. 634, 637–638 (E. D.Pa.1973). Moreover, this language made it abundantly clear to the jury that "mere presence", without some positive act of association with the requisite specific intent, is not sufficient to support a conviction for aiding and abetting, see *United States v. Hill*, 464 F.2d 1287, 1288–1289 (8th Cir. 1972).

There is ample evidence in this record for the jury to have concluded, beyond a reasonable doubt, that Christian and Griffin remained behind with Mrs. Kelly and her grandchildren to guard them, and to lend credence to Clark's threat that if anything went wrong at the bank—that is, if Ernest Kelly did not cooperate and turn over the contents of his safety deposit box to Dabney—then Clark would telephone the house and have Christian, Griffin and Clinton kill everyone in the family. Such participation by Christian and Griffin was far from "mere presence" at the scene of a crime; indeed, it was a *sine qua non* for the success of the entire criminal venture.

Accordingly, the motions based upon the asserted insufficiency of the evidence to support conviction of Christian and Griffin on charges of aiding and abetting will be denied.

We are satisfied that these defendants received fair treatment in accordance with the most stringent standards of the administration of criminal justice at every stage of the proceedings, both before trial and during the entire trial itself. Accordingly, for the reasons set forth in this opinion, the post-trial motions filed by defendants Clark, Christian and Griffin will be denied. An appropriate order will be entered denying these motions and setting the dates for sentencing of these defendants.

---

18. Similar instructions were delivered with respect to the aiding and abetting charges in Counts V and IX.